## WESTERN UNION TELEGRAPH CO. v. DELAWARE, L. & W. R. CO.

### (District Court, S. D. New York. June 5, 1922.)

1. **Money paid ⊚⟞3—Railroad, required by statute to pay tax on telegrams sent by it, may not question its validity, when sued by telegraph company, which paid tax on demand of revenue officers under color of office.**

   The validity of a tax on telegrams sent for a railroad under agreement for exchange of services, imposed by virtue of Revenue Act 1918, § 500f (Comp. St. Ann. Supp. 1919, § 6309⅓a), as construed and applied by Regulation No. 57, art. 7, promulgated by the Commissioner of Internal Revenue, cannot be questioned by the railroad company, when sued by the telegraph company, which paid the tax on demand by the revenue officers under color of their office, as the burden of paying it and testing its validity by proceeding for refund should fall on the railroad company, which under the act was supposed to pay the tax.

2. **Internal revenue ⊚⟞11—Regulation of Commissioner, applying tax on telegrams to those sent under contract for exchange of services, upheld.**

   If necessary to consider whether Regulation No. 57, art. 7, promulgated by the Commissioner of Internal Revenue, applying to telegrams sent for a railroad under contract for exchange of services, the tax which Revenue Act 1918, § 500f (Comp. St. Ann. Supp. 1919, § 6309⅓a), imposes on telegrams, and which section 501c (section 6309⅓b) provides shall apply to all such services rendered for hire, was within the authority of the Commissioner, it would be upheld, in the absence of evidence of its unreasonableness.

At Law. Action by the Western Union Telegraph Company against the Delaware, Lackawanna & Western Railroad Company. Judgment for plaintiff.

Rush Taggart and Francis R. Stark, both of New York City, for plaintiff.

W. S. Jenney and Douglas Swift, both of New York City, for defendant.

MACK, Circuit Judge. The Western Union Telegraph Company brings this action to recover $4,530.70, which it paid to the Department of Internal Revenue of the federal government as a tax upon 50,098 messages transmitted by it for the Delaware, Lackawanna & Western Railroad during the period from March 1 to December 31, 1920, under a contract entered into by the parties on July 1, 1905, for the exchange of services. The pertinent provisions of the contract are set forth in the margin.[1]

[1] The telegraph company also agrees to issue to such officers of the railroad company as may be designated by the president or general superintendent thereof annual franks authorizing the free transmission of messages signed by such officers and answers thereto, relating strictly to the railroad or corporate business of the railroad company's railroads covered by this agreement, originating at or destined to points on the telegraph company's lines in the United States beyond or off the line of said railroads, to an amount not exceeding in any one year twelve hundred and fifty dollars ($1,250.00) for each one million dollars ($1,000,000) of gross earnings of the railroad company (not including sale of coal, but including coal freight earnings), for such year, as, for example, if such gross earnings of the railroad company in one year equal $10,000,000, then such amount would not exceed $12,500.

The tolls on all of such messages to or from points beyond or off the line of said railroads shall be calculated at the regular commercial day rates of the

The tax was imposed by section 500f of the Revenue Act of 1918, as construed and applied in article 9 of Regulation No. 57 promulgated by the Commissioner of Internal Revenue. The Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, §§ 6309⅓a, 6309⅓b) provides:

"Sec. 500. That from and after April 1, 1919, there shall be levied, assessed, collected, and paid, in lieu of the taxes' imposed by section 500 of the revenue act of 1917—

⁕        *        *        *        *        ⁕        *        *        :⁎

"(f) In the case of each telegraph, * * * dispatch, message, or conversation, which originates on or after such date within the United States, and for the transmission of which the charge is more than 14 cents and not .more, than 50 cents, a tax of 5 cents; and if the charge is more than 50 cents, a tax of 10 cents. * * *

"Sec. 501 (a) That the taxes imposed by section 500 shall be paid by the person paying for the services or facilities rendered. * * *

"(c) The taxes imposed by section 500 shall apply to all services or facilities specified in such section when rendered for hire, whether or not the agency rendering them is a common carrier. In case a carrier (other than a pipe line) principally engaged in rendering transportation services or facilities for hire does not, because of its ownership of the goods transported, or for any other reason, receive the amount which as a carrier it would otherwise charge, such carrier shall pay a tax equivalent to the tax which would be imposed upon the transportation of such goods if the carrier received payment for such transportation, such tax, if it cannot be computed from actual rates or tariffs of the carrier, to be computed on the basis of the rates or tariffs of other carriers for like services as determined by the commissioner. * * *"

## Article 9 of Regulation No. 57 reads as follows:

"Art. 9. Messages transmitted under contract, where, by contract, a telegraph, telephone, radio, or cable company agrees, in consideration of the payment of a lump sum or of the performance of services, to transmit messages on frank, such messages are subject to the tax imposed by this section (500f) of the act. The tax on each such message is to be computed upon the amount of the regular established charge for the transmission of similar messages for ordinary customers, calculated at the regular fixed rate provided in the tariffs of the transmitting carrier. The questions as to whether such messages relate to the operation of the business of a common carrier and whether they are 'on line' or 'off line' are immaterial. Thus, a telegraph company agrees to transmit over its lines on a railroad line all messages relating to railroad business 'free' and all such messages over its lines off the railroad lines 'free' to an amount not exceeding $10,000 per year calculated at its regular rates, and all messages over that amount at half rates, in consideration of services to be performed by the railroad in the transportation of men and materials of the telegraph company. All such messages, whether 'on line' or 'off line,' and whether 'free' or at half rates, are subject to the tax provided, by this section (500f) of the act. The tax must be computed, collected, and paid upon each such message. (Where common·carrier is a railroad under federal control, see article 14.)"

The case is submitted on an agreed statement of facts. It is admittedly a friendly suit to determine whether messages transmitted without charge under a contract providing for the mutual interchange of services between the telegraph company and the railroad company may be taxed under the Revenue Act of 1918. Counsel for the de-

telegraph company between the points at which such messages originate and the points to which they may be destined; and the railroad company agrees to pay to the telegraph, company one-half of its aforesaid rates on all such messages in excess of said amount above mentioned. Settlements under this section are to be made yearly.

fendant expressly states in his brief that the only question in the case is whether or not such messages were taxable under section 500f of the act. At the argument he made the following statement:

"I want to say at the outset that the only question we desire to raise in this case is whether or not these messages are taxable under section 500(f) of the act. If they are taxable, we concede our liability to reimburse the telegraph company for the amount which it has paid as a message tax on such messages."

The government was informed of the suit, but, judging from the pleadings and stipulation of facts submitted by the parties that the validity of the regulations promulgated by the Commissioner of Internal Revenue was only incidentally involved, and the determination of their validity was not necessary to the decision, and having suggested to the litigants that the most desirable way of testing the validity of the regulations would be to file a claim for a refund of the taxes paid, and upon the rejection of such claim to institute a suit to recover the tax, the Commissioner of Internal Revenue and his solicitor considered it inadvisable to take any part in this litigation until expressly requested by the court to file a brief as amicus curiæ. It may be of use to set forth as Appendix A the correspondence between the court and the Department of Internal Revenue in this connection.

While, of course, any decision as between the parties would not bind the government, which is not a party, none the less, if the decision rendered involved a construction of the Revenue Act the government might be affected in subsequent litigation by the rule of stare decisis. The government was under the impression that this litigation only incidentally involved a construction of the act and pointed out that under the pleadings two important legal questions were raised quite irrespective of the validity of the regulations, to wit: (1) Whether a carrier is civilly liable to the government for the tax it fails to collect apart from and in addition to the penalties provided by the act; and (2) whether the sender is civilly liable to the carrier if the carrier pays the tax but fails to collect the same when the message is transmitted. It seems apparent, however, from defendant's counsel's statements, that the defendant does not rely upon either of the contentions above stated, but solely upon the invalidity of the tax imposed. It seems to be agreed as between the parties that if the tax was properly paid to the treasury the amount thereof is to be paid by the railroad to the telegraph company. The question at issue would therefore seem to be similar to that involved if the telegraph company had required the payment of the tax before sending the message, and the railroad, having paid the same, not voluntarily, but under protest, were seeking to recover it.

Counsel for Western Union indicated that in his judgment there was no provision in the law enabling the company to claim a refund from the government, and therefore this friendly suit was brought to test the validity of the tax. I am at a loss, however, to understand why, under Revised Statutes, §§ 3220, 3226, and 3227 (Comp. St. §§ 5944, 5949, 5950), a claim could not be filed and a suit instituted either by the telegraph company or by the railroad company, if it paid

the tax, to recover back the tax alleged to have been wrongfully enforced and collected. Section 1310 of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 6371½k) seems expressly to contemplate the contingency of refund in cases of this sort and the proper adjustment thereof among the parties in interest. It provides:

"(a) That in the case of any overpayment or overcollection of any tax imposed by sections 628 or 630 or by title V, title VIII, or title IX, the person making such overpayment or overcollection may take credit therefor against taxes due upon any monthly return, and shall make refund of any excessive amount collected by him upon proper application by the person entitled thereto. * * * "

See contract as set forth in margin.[2]

The Commissioner of Internal Revenue suggested to the litigants that the most desirable way of testing the validity of the regulation was by filing a claim for a refund and upon its rejection bringing suit, and I certainly should be loath to believe that the administrative agents of our government would in any way endeavor to deprive the parties in interest of their day in court, if they should proceed in the manner contemplated by our statutory law. Indeed, it would seem that, if the validity of the tax were denied in this proceeding, the only recourse of the Western Union would then be to seek a refund from the treasury. The only real justification for a suit of this kind, in my judgment, is to compel the railroad company, upon which the tax was supposed to fall, to exonerate the telegraph company and then to litigate the question of the validity of the burden imposed upon it with

[2] "The railroad company agrees to transport free of charge over its railroads covered by this agreement, upon application of the president, vice president, or superintendent of the telegraph company, all persons in the employ of the telegraph company when traveling on the business of said company, and also to transport and distribute free of charge along the line of its railroads covered by this agreement all poles, wire, and other material and supplies for the construction, maintenance, operation, repair, and reconstruction of the lines and wires covered by this agreement, and of such additional wires and lines of poles and wires as may be erected under the provisions of this agreement, and also all material and supplies for the establishment, maintenance, and operation of the offices of each of the parties hereto at places along or adjacent to or at the termini of said railroads.

"And the railroad company further agrees to transport without charge over its railroads covered by this agreement the poles, wire, and other materials and supplies of the telegraph company, to be used on its lines beyond or off the line of said railroads covered by this agreement, to an amount computed at the regular current through or local transportation rates of the railroad company, as the case may be, not exceeding seven thousand dollars ($7,000) per annum during each of the first five (5) years, and not exceeding eight thousand seven hundred and fifty dollars ($8,750) per annum during each of the next fifteen (15) years, and not exceeding ten thousand five hundred dollars ($10,500) per annum during each of the next ten (10) years; of the term of this agreement, for the first one thousand (1,000) miles or less of railroad owned, leased, or controlled by the railroad company and occupied by a telegraph line erected thereon and operated under the provisions of this agreement, and five dollars ($5) per annum additional for each additional mile of railroad constructed, owned, leased, or controlled by the railroad company and occupied as aforesaid; and the telegraph company agrees to pay to the railroad company one-half of its aforesaid rates on all such transportation of poles, wire, and other material and supplies in excess of said amount. Settlements to be made yearly."

the government. But from the manner of presentment it would appear that the parties were more intent upon testing the legality of the tax than the right of the telegraph company to be exonerated. None the less I must consider the legal relation of the two parties and the consequences flowing therefrom quite apart from the possible purposes they might desire to achieve in litigating their claims in any particular manner.

If the telegraph company had refused to send the message before receiving the tax or an agreement of indemnity of some sort, and the railroad company had then sought to enjoin the attempted collection of the tax by the telegraph company, it probably could have succeeded in having the legality of the tax tested in advance of its collection, on the analogy of Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759, Brushaber v. Union Pacific R. Co., 240 U. S. 1, 36 Sup. Ct. 236, 60 L. Ed. 493, Ann. Cas. 1917B, 713, L. R. A. 1917D, 414, and Hill v. Wallace, 258 U. S. ——, 42 Sup. Ct. 453, 66 L. Ed. ——, notwithstanding the provisions of section 3224, Revised Statutes (Comp. St. § 5947), that the collection of taxes by the federal revenue officers under color of their office shall not be enjoined by the courts. Indeed, in Hill v. Wallace, supra, the Supreme Court declares, on the authority of Dodge v. Brady, 240 U. S. 122, 126, 36 Sup. Ct. 277, 60 L. Ed. 560, "that section 3224 of the Revised Statutes does not prevent an injunction in a case apparently within its terms in which some extraordinary and entirely exceptional circumstances make its provisions inapplicable," and indicates that such is a case where numerous transactions are in question, involving heavy penalties and a multiplicity of suits. Possibly, therefore, even the telegraph company might successfully have sought an injunction against the collection of the tax.

But the usual channels provided by Congress for testing the legality of taxing measures are normally exclusive, and recourse is not to be had to other channels unless necessary to prevent irreparable injury and great confusion. No such emergency exists in the instant case. There is no good reason, so far as I am able to observe, why a refund should not be sought from the treasury, and why, if refused, a suit should not be instituted to recover the amount alleged to have been collected without warrant of law in the manner provided by Congress.

[1] If, as a practical matter, the telegraph company was obliged under color of law to pay the alleged tax, and no steps to enjoin such collection were taken by the railroad company or the telegraph company, it would seem that the burden of the payment and of the contest of the legality of the tax, if there is to be any, ought to fall upon the party who, under the act, was supposed to pay the tax. There is nothing in any of the above-cited cases to indicate that, if the tax in those cases had been paid, the corporate or association officers so paying would have become personally liable therefor to their principal, or would have been refused reimbursement of a tax paid on demand by the revenue officers under color of their office, or that the principal could have questioned the legality of such a tax save through its suit to recover back. It seems to me that in the circumstances of the

instant case the railroad company had no more right to question this payment made for its account by the telegraph company under color of law than a principal would have to question a payment reasonably and in good faith made by his agent in the course of his duties. Possibly, if the railroad company had in advance taken the position, as against the telegraph company, that it would in no circumstance pay the alleged tax, it could have urged that as between the parties there was no liability irrespective of the validity of the tax. But the railroad company admits liability if the tax is valid. The parties were apparently agreed that the messages should be sent, and that the tax, if properly paid, should be borne by the railroad company. Conceivably the parties might have agreed between themselves that the railroad company would bear the tax only if its validity were established in a court of law. But even in that case, in my judgment, the telegraph company would have to test the validity of the tax in a suit to recover back; the parties could not arrange to test the legality of the regulation after the tax had been paid, in any manner convenient to themselves, as in a friendly suit to which the government was not a party. The tax was paid under color of law and should in consequence as between the parties be borne by the railroad company. The parties cannot by their own agreement change the method provided by Congress for testing the validity of tax legislation.

It is unnecessary to expand upon the unwisdom and impolicy of passing upon the legality of important taxing measures in a collateral proceeding of this character, to which the government is not a party, and of which, because of the possible collateral issues involved, the treasury may have, as was apparent by the case here before the court intervened, an insufficient understanding. In the Pollock, Brushaber, and Hill Cases the tax had not been collected, and to prevent great confusion and irreparable damage the court entertained jurisdiction; the instant case, as we have seen, presents no such necessity for preventive justice.

Indeed, it would appear that to allow the validity of a tax to be questioned in a proceeding of this character might work an injustice even as between the parties. Suppose in a suit of this kind, with the government not represented, the tax were declared invalid, and subsequently, when the telegraph company sought a refund from the treasury, the government brought new considerations to the attention of the court before which the matter was taken that induced the court to sustain the tax. In the absence of a protective understanding between the parties, it is obvious that in that event the telegraph company would be saddled with a tax which the law contemplated should fall on the railroad. Counsel for the telegraph company stated that, if the case were decided in any way adverse to the government's contention, he would undertake to appeal to the higher courts, as if such an appeal were necessary in the government's interests. Indeed, if anything, the contrary is true. In order reasonably to insure that the ruling in this case, if adverse to the government, would be followed in a suit by the telegraph company to recover back the amount paid,

it would be necessary for the company in its own interest to secure a final judgment in this case from the Supreme Court.

[2] But, if I should err in my judgment that it is unnecessary for me to consider in this suit whether or not it was within the lawful authority of the Commissioner of Internal Revenue by regulation to apply the tax provided in section 500f of the Revenue Act of 1918 to contracts for the exchange of services, I should not hesitate to uphold the regulation in the absence of evidence of its unreasonableness. In Postal Telegraph-Cable Co. v. T. & T. R. Co., 248 U. S. 471, 39 Sup. Ct. 162, 63 L. Ed. 365, the court had to construe the Interstate Commerce Act and to determine whether, in view of the fact that an exchange of services was expressly permitted by the act, the exchange could be made without reference to the regularly established rates or charges exacted by other customers. The decision that it could be so made is of little help here. The Revenue Act provides that the taxes shall apply to all services rendered for hire. Giving reasonable scope to the legislative intent, the act, in my judgment, must be construed to cover all messages transmitted for an economic consideration—money or money's worth. It is difficult under a sound taxing policy to find a basis for differentiation between exchanges and cash-paid services.

Counsel for the railroad company urges that the provisions in the act expressly providing for a tax on transportation services in respect of goods owned by the carrier indicate that the exchange of services, not being expressly enumerated, was impliedly excluded from taxation. But in my judgment these provisions tend rather to emphasize the broad and inclusive legislative intent. True, there might be some difficulty in working out the valuation to be placed upon messages transmitted under exchange of service agreements; but the administration of the act is vested in the Commissioner of Internal Revenue, who is empowered to issue regulations necessary and proper to carry into effect the general provisions of the law. The regulation issued by the Commissioner seems to comport with the general tenor of the act, and the record and arguments advanced before me do not indicate that it is unreasonable as applied to the present controversy. In cases of this kind, administrative rulings made by the department, after careful consideration of the problem as it affects the country as a whole, ought not lightly to be disturbed by the courts.

Judgment for the plaintiff.

### Appendix A.

Woolworth Building, February 3, 1922.

Sir: There has been submitted to me the case of Western Union Telegraph Co. v. Delaware, Lackawanna & Western Railroad Co., for the recovery of moneys paid to the Department of Internal Revenue on certain telegraph messages transmitted by the plaintiff for the defendant, which were claimed to be taxable under section 500f of the Act of 1918. I am told that similar controversies exist as against all the railroads of the country and that therefore the case is of great importance.

The suit is concededly a friendly suit. While, of course, any decision as between the parties will not bind the government, which is not a party, the decision that may be rendered will involve a construction of the act, and to that

extent affect the government. In order that the government views on the construction of the act may be fully presented, I beg to suggest to you the propriety of the solicitor of your department filing a brief in the matter as amicus curiæ.

I stated to the parties that I should write to you to this effect.

Respectfully,                    Julian W. Mack, U. S. Circuit Judge.
Commissioner of Internal Revenue, Washington, D. C.

Treasury Department, Office of Commissioner of Internal Revenue,
                    Washington, February 24, 1922.

In re Western Union Telegraph Co. v. Delaware, Lackawanna & Western Railroad Co.

Sir: Receipt is acknowledged of your communication of the 3d instant, advising that the above-entitled case had been submitted to you, and suggesting the propriety of the Solicitor of Internal Revenue filing a brief in the matter as amicus curiæ, in view of the fact that the decision which may be rendered will involve a construction of section 500f of the Revenue Act of 1918.

It appears that the plaintiff in this case seeks to recover the sum of $4,530.70 which it paid to the government for and as taxes pursuant to the provisions of the Revenue Act of 1918 and Regulation No. 57 (revised), alleging that this amount was paid for and in behalf of the defendant and that by reason of the premises the defendant is obligated under the provisions of the Revenue Act of 1918 to reimburse the plaintiff the amount of taxes so paid by it.

This office has been heretofore advised by the parties to this litigation of the institution of the suit, and the Solicitor of Internal Revenue was given an opportunity to appear in behalf of the department and argue the validity of the regulations under which the tax in question was imposed. The Solicitor declined to become a party to the suit or to appear in any capacity, for the reason that an examination of the pleadings disclosed that the question of the validity of the regulations was only incidentally raised, and that a determination of the validity of said regulations was not necessary to a decision in the case. It was suggested to the litigants that the most desirable way to test the validity of the regulations was by filing a claim for refund of the taxes paid and upon the rejection of such claim instituting suit to recover the tax.

In support of the proposition that a determination of the legality of the tax as construed by the regulations is not necessary to a decision in the case the following suggestions are respectfully submitted:

The theory upon which the government proceeds with respect to the tax levied by section 500f of the Revenue Act of 1918 is that the tax is imposed primarily on the person sending the message and paying for the same, and that the carrier rendering the services or furnishing the facilities is required to collect this tax from the sender of message and to turn the same over to the collector of internal revenue. The civil liability to the government of a carrier who fails to collect the tax is already the subject of considerable difference of opinion, although such carrier is unquestionably liable for a penalty in the amount of the tax which it fails to collect. Again, conceding the validity of the tax, the question of the civil liability of the sender of the message to the carrier transmitting the same, although the carrier itself pays the tax which it has failed to collect at the time of transmitting the message, is also controversial. Thus it is seen that, although the validity of the regulations is sustained in this case, the defendant might yet have judgment on the ground that the plaintiff was not required by the law and regulations to pay over to the government as taxes an amount which it had not collected as such. Again, although it is held that the plaintiff is required by the law and regulations to pay over to the government a tax which it had not collected from the sender of the message, the defendant might nevertheless have judgment on the ground that the plaintiff, having paid over to the government taxes which it had not collected, paid such taxes on its own behalf and not for or in behalf of the defendant.

However, this office wishes to express its appreciation of your timely suggestion, and if, after giving consideration to the position of the department as outlined in the foregoing statement, you still desire to have before you an

argument in defense of the regulations in your consideration of the case this office will be glad to submit a brief in the matter as suggested.

Respectfully,                                          D. H. Blair, Commissioner.

Hon. Julian W. Mack, United States Circuit Judge,
   Woolworth Building, New York, N. Y.

February 28, 1922.

In re Western Union Telegraph Co. v. Delaware, Lackawanna & Western Railroad Co.

Sir: I beg to acknowledge receipt of your letter of February 24. The parties, in their stipulation of facts in this case, state that the controversy "involves the proper construction, interpretation, and application of  *   *   *  the Revenue Act of 1918." Moreover, the counsel for the defendant, in his memorandum of law, asserts "the only question in the case is whether or not said messages were taxable under section 500f of the act."

It would therefore seem to me that, in order that the government's point of view might be clearly set forth, it would be advisable for you to submit a brief in the matter. Of course, your brief need not be confined to a defense of the regulations, but may cover the question as to whether the validity of the regulations can be questioned in a collateral proceeding of this character.

Respectfully,                                          Julian W. Mack.

Commissioner of Internal Revenue.

Department of Justice, Office of the Solicitor of Internal Revenue,
                                          Washington, March 2, 1922.

In re Western Union Telegraph Co. v. Delaware, Lackawanna & Western Railroad Co.

Sir: Receipt is acknowledged of your communication of February 28, 1922, in connection with the above-entitled cause, which is now pending before you for decision. In compliance with your request, this office will submit, as early as possible, a brief in the matter, outlining the position of the government with respect to the issues involved in the case.

This office wishes to express its appreciation of your manifest desire to see that the interests of the government are properly protected.

Respectfully,                                          Carl A. Mapes, Solicitor.

Hon. Julian W. Mack, United States Circuit Judge,
   Woolworth Building, New York, N. Y.

Department of Justice, Office of the Solicitor of Internal Revenue,
                                          Washington, April 1, 1922.

In re Western Union Telegraph Co. v. Delaware, Lackawanna & Western Railroad Co.

Sir: In compliance with your request of February 28, 1922, there is herewith submitted a memorandum prepared in this office for your use in considering the merits of the above-entitled case. As will be noted, this brief is not confined to a defense of the regulations which have been questioned in this suit, but also covers the question of the right to attack the legality of a tax in a collateral proceeding of this character.

This office will be glad to furnish any further information in connection with the case which you may desire.

Respectfully,                                          Carl A. Mapes, Solicitor.

Hon. Julian W. Mack, United States Circuit Judge,
   Woolworth Building, New York, N. Y.