# HELLMICH, COLLECTOR, *v.* MISSOURI PACIFIC RAILROAD COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 507.   Argued January 18, 1927.—Decided February 21; 1927.

1. Messages transmitted for a railroad company by a telegraph company under a contract entitling each, in its business, to the "free"

services of the other up to a stated value each year, as gauged by their respective public tariff rates, or on a cost-plus basis where the tariffs are inapposite, are subject to Revenue Acts, 1918 and 1921, §§ 500, 501, imposing taxes on telegraph messages according to the amounts charged therefor and payable by the person paying for the service. *Postal Telegraph Co.* v. *Tonopah R. Co.,* 248 U. S. 471, distinguished. P. 251.

2. Paragraph (c) of § 501, of the Revenue Act of 1918, has no application to taxes on telegraph messages but relates to taxes on transportation of commodities or materials by carriers. P. 255.

12 F. (2d) 978, reversed.

CERTIORARI (*post,* p. 678) to a judgment of the Circuit Court of Appeals which reversed in part a judgment of the District Court in favor of Hellmich, Collector, in a suit by the Railroad Company to recover taxes, assessed on telegraph messages, and paid under protest.

*Assistant Attorney General Willebrandt,* with whom *Solicitor General Mitchell* and *Messrs. Sewall Key,* Attorney in the Department of Justice, *A. W. Gregg,* and *Charles T. Hendler* were on the brief, for petitioner.

The error lies in the conclusion that the telegraph messages transmitted for the Railroad were, under the terms of the contract, free. While the compensation was not in money, it was in money's worth. This is shown not only by the terms of the contract itself, but from the nature of such contracts generally, as recognized by enactments of Congress and by the opinion of this Court in *Postal Tel. Co.* v. *Tonopah R. R. Co.,* 248 U. S. 471. The language of the revenue acts is sufficiently broad in scope to include telegraph messages so paid for. Respondent's efforts to interpret the revenue acts in the light of the interstate commerce acts must fail, for the reason that the two classes of laws are not *in pari materia.* The correct principle for decision of the question involved is to be found in *Western Union Tel. Co.* v. *D. L. & W. R. R. Co.,* 282 Fed. 925, and *D. L. & W. R. R.*

*Co.* v. *Bowers,* decided January 22, 1926 (D. C. N. Y. S.), unreported.

*Mr. Edward J. White,* with whom *Mr. James F. Green* was on the brief, for respondent.

The amount of telegrams sent each year under the terms of the contract up to $75,000 was exempt from taxation, because there was no "charge" for such service within the meaning of the Act, it being necessary to the accrual of a tax that there should be a "charge." There is no "charge" for services when the creditor has no right to demand payment in money. *L. & N. Ry. Co.* v. *Mottley,* 219 U. S. 467; *Tex. & P. Ry. Co.* v. *Mugg,* 202 U. S. 242; *C. I. & L. Ry. Co.* v. *United States,* 219 U. S. 486. Subdivision (f) of § 500 does not impose a tax where there is no right of the Telegraph Company to demand payment for the telegrams sent.

All the telegrams sent by the Telegraph Company for the Railroad upon which the tax was attempted to be collected were exempt from the tax. Secs. 500, 501(a), Revenue Act, 1918; secs. 500, 501, 502(a), Revenue Act, 1921. Article 46(c) of Regulations 49, promulgated by the Commissioner of Internal Revenue, admits that on a proper and fair construction of the statute there is no "charge" on any of the service rendered by the Telegraph Company to the Railroad up to the amount of $75,000, provided for in the contract.

As the tariffs, rates and charges established under the Interstate Commerce Act do not apply under an agreement for an exchange of service between common carriers, the "charge" which is attempted to be taxed under § 500 does not exist. Sec. 4563[3] Comp. Stats. 1916.

The other subdivisions of § 500 of the Act of 1918 imposing a tax upon the amount "paid" are associated with subdivision (f) imposing a tax upon the amount of the "charge," and this association of subdivisions requires

that that meaning of the word " charge ". be accepted which is closest to the meaning of the word " paid." *Gould* v. *Gould,* 245 U. S. 153; *United States* v. *Field,* 255 U. S. 257; *Smietanka* v. *Bank,* 257 U. S. 602; *United States* v. *Salen,* 235 U. S. 237; *United States* v. *Weitzel,* 246 U. S. 533.

In attempting to tax services which the Railroad Company was authorized to exchange with the Telegraph Company and to asssess such tax upon " all such messages whether ' on line or off line ' and whether ' free or dead-head rates,' " the Commissioner of Internal Revenue was, in effect, repealing the provisions of the Act to Regulate Commerce authorizing such free exchange of services and the decision of this Court that such free exchange of services whether on or off the line of the Railroad Company was proper. *Postal Tel. Co.* v. *Tonopah R. R. Co.,* 248 U. S. 471.

*Messrs. Kingman Brewster* and *James S. Y. Ivins* filed a brief, as *amici curiae,* by special leave of Court.

Mr. Chief Justice Taft delivered the opinion of the Court.

The Missouri Pacific Railroad Company brought this suit in the United States District Court for the Eastern District of Missouri, against Hellmich, U. S. Collector of Internal Revenue, to recover taxes amounting to $14,792.95, paid by it under protest, for the transmission of telegraph messages from March, 1920, to January, 1923, inclusive. The messages in question were transmitted under the terms of a contract dated October 24, 1911, for the exchange of services between the Western Union Telegraph Company, on the one part, and the Missouri Pacific Railroad Company and the St. Louis, Iron Mountain & Southern Railway Company, on the other part. To the rights and obligations of these two railway com-

panies the respondent company, the Missouri Pacific Railroad Company, succeeded. The question of the legality of the taxes arises under two acts of Congress. The first is the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1101 and 1102, which provides in its section 500,

" That from and after April 1, 1919, there shall be levied, assessed, collected and paid, in lieu of the taxes imposed by Section 500 of the Revenue Act of 1917—

. . . . . . .

" (f) In the case of each telegraph, telephone, cable or radio, dispatch, message, or conversation, which originates on or after such date within the United States, and for the transmission of which the charge is more than 14 cents, and not more than 50 cents, a tax of 5 cents; and if the charge is more than 50 cents, a tax of 10 cents; Provided, That only one payment of such tax shall be required, notwithstanding the lines or stations of one or more persons are used for the transmission of such dispatch, message, or conversation.

" Section 501 (a). That the taxes imposed by Section 500 shall be paid by the person paying for the services or facilities rendered."

The second is the Revenue Act of 1921, c. 136, 42 Stat. 227, 284, §§ 500 and 501 of which contain exactly the same language as that just quoted from the Act of 1918.

The District Court held that the messages here in question came within these sections, and gave judgment for the Government. The Circuit Court of Appeals of the Eighth Circuit reversed the District Court, holding that the telegraph messages, up to the amount of $75,000 annually thus taxed, were exempt, but that those in excess of that amount were subject to the tax.

The point in the case is to determine whether these messages can be construed to be messages for the transmission of which there can be said to be a charge. The contention of the railroad company is that, in the sense

of this § 500, the messages in question are not charged for at all, and that they can not be fitted into the section, so that it can be construed to cover them. We must, therefore, consider the contract under which the messages for the railroad company were sent by the telegraph company. It was dated October 24, 1911, and is of indefinite duration. By its fourth paragraph, the telegraph company agrees to perform, for the railway companies, telegraphic service between points on its lines in the United States, either on or off the lines of the railways covered by this agreement, as the railway companies may desire, for messages pertaining to their railroad business, under franks issued to their officers and agents permitting all classes of messages and telegraphic letters in public use on the lines of the telegraph company. The railway companies agree to perform promptly such transportation and distribution service over their railroads as the telegraph company may require for its employees, supplies, and material, whether for work or use along the railroads or beyond or off their lines, and to furnish special trains, engines, crews and equipment for distribution service, and outfit, boarding and tool cars for work on their lines, whenever required by the telegraph company. The transportation of employees is to be authorized by passes to be issued by the railway companies on authorized request. The service performed by either party for the other is to be charged for at its regular current telegraph rates, or its through or local transportation rates, as the case may be, for the class of services rendered. Services performed by either party for the other for which there are no regular or published rates, and not otherwise provided for in this agreement, are to be charged for at actual cost, as determined by the officers of the party rendering the service, plus not exceeding 25 per cent. of such cost. At the close of each contract year, bills are to be rendered by each party to the other for all services performed by

each party for the other during such year. If the bill
therefor rendered by either party to the other exceeds the
sum of $75,000 in any contract year, the party receiving
such service is to pay to the party rendering the same
the amount of such excess, provided that in the event the
services of both are in excess of $75,000 in any contract
year, the party in arrears is to pay to the other party
the difference between the amounts of such accounts; and
if the bills rendered by each party to the other for such
services in any contract year do not exceed $75,000, there
is to be no payment by either party to the other therefor.

By the fifth paragraph of the contract, it is provided
that the telegraph or telephone operators of the railway
companies at stations where the messages are less in
number than 3,000 a year, are to act as the agents of the
telegraph company and receive and transmit them,
charging the tariff rates and rendering to the telegraph
company monthly statements of the business, and are
to pay the receipts therefor to the telegraph company,
but the railway companies are not to be liable for receipts
thus to be received and paid over. The railway operators
and employees in such service are to conform to the rules
and regulations of the telegraph company. They are not to
transmit over the wires of either party any free messages
except those of the railway company's business. For
messages transmitted for it by the employees of the rail-
way company the telegraph company agrees to pay the
railway companies 10 per cent. of the gross cash receipts,
except on ocean cable messages, receipts for which are to
be retained in full by the telegraph company.

Pursuant to the authority vested in him by the Reve-
nue Acts, the Commissioner of Internal Revenue, with
the approval of the Treasury, promulgated Article IX of
Regulation No. 57 of the Treasury Department, as to the
proper construction of this section 500 (f) of the Act of
1918, as follows:

"Messages transmitted under contract.—Where, by contract, a telegraph, telephone, radio, or cable company agrees, in consideration of the payment of a lump sum or of the performance of services, to transmit messages on frank, such messages are subject to the tax imposed by this section (500 (f)) of the act. The tax on each such message is to be computed upon the amount of the regular established charge for the transmission of similar messages for ordinary customers, calculated at the regular fixed rate provided in the tariffs of the transmitting carrier. The questions as to whether such messages relate to the operation of the business of a common carrier and whether they are 'on line' or 'off line' are immaterial. Thus, a telegraph company agrees to transmit over its lines on a railroad line all messages relating to railroad business 'free' and all such messages over its line off the railroad lines 'free' to an amount not exceeding $10,000 per year calculated at its regular rates, and all messages over that amount at half rates, in consideration of services to be performed by the railroad in the transportation of men and materials of the telegraph company. All such messages, whether 'on line' or 'off line,' and whether 'free' or at half rates, are subject to the tax provided by this section (500 (f)) of the act. The tax must be computed, collected, and paid upon each such message."

The case was heard upon a stipulation of facts, with some short additional testimony furnished by the officers of the railway company, as to the actual business transactions between the railway company and the telegraph company during the years in question.

The evidence shows that, so far as the transportation of men and material was concerned, the railroad company kept a record of all transportation furnished to the telegraph company at tariff rates. At the end of the contract year, statements setting forth the transportation and the

charges were furnished to the Western Union. After they were verified by the Western Union they became the basis for settlement under the contract. A similar arrangement was made by the Western Union, as to the messages which it charged at its regular public rates.

For the contract year ending August 31, 1920, the total amount of business handled by the Missouri Pacific Railroad Company for the Western Union amounted to $80,721.72, or $5,721.72 in excess of the $75,000 allowance under the contract. During the same year the amount of business handled by the Western Union for the Missouri Pacific Railroad Company in telegraph messages was $71,815.17. That was $3,184.83 less than the amount provided for under the contract; and for that year no payment was made by the Missouri Pacific to the Western Union Telegraph Company for such messages. For the year ending August 31, 1921, the net amount of business done by the railroad company in the way of transportation, etc., for the telegraph company was $144,023.95. This was $69,023.95 in excess of the $75,000. During the same year the business handled by the telegraph company in messages for the railroad company amounted to $86,221.92, or $11,221.92 in excess of the contract allowance. During that year the Western Union Telegraph Company paid the railroad company the difference between $69,023.95, and $11,221.92, or $57,802.03. For the year ended August 31, 1922, the net amount of business handled by the railroad company for the telegraph company in the way of transportation was $132,349.02, or $57,349.02 in excess of the $75,000 limit, while the amount of business in messages handled by the telegraph company for the railroad company was $83,342.17, or $8,342.17 in excess of the same limit; and that year the telegraph company paid the railroad company the difference between $57,349.02 and $8,342.17, or $49,006.85. It further appeared that the taxes which accrued under

the construction imposed by the Commissioner of Internal
Revenue, from August, 1922, to January, 1923, were as
follows:

| | |
|---|---:|
| August, 1922 | $647.62 |
| September, 1922 | 604.55 |
| October, 1922 | 885.30 |
| November, 1922 | 797.25 |
| December, 1922 | 937.80 |
| January, 1923 | 883.60 |
| Total | $4,756.12 |

Upon these facts we think that the telegraph messages
were subject to the tax imposed by § 500 in each law. We
think that the messages were charged for, in the sense of
that section, and that Article IX of the regulations No.
57 of the Treasury Department was a proper regulation
to carry out the statute with reference to such a contract
as this. The method adopted for the mutual charges was
an agreement between the companies that, up to a cer-
tain amount, they were willing to run the risk that the
compensation to be paid by each for the service of the
other would not average more than the same sum. The
contract was a contract for many years, the amount of
the service on the one hand and on the other might vary
from year to year; but, year in and year out, the two
companies felt that $75,000 would be a safe sum for both.
In exceptional years, if either had the advantage beyond
$75,000, this should be made up for by the actual pay-
ment of cash for the excess to the party earning it.

In argument, extreme instances for a single year were
supposed, such that, as between the two contracting par-
ties, no transportation would be furnished and so no com-
pensation would be received by the telegraph company
for the messages actually sent by it. Such a hypothesis
is not a test of the actual equilateral character of the con-
tract in its reciprocal obligations. $75,000, in the experi-
ence and judgment of the parties, measured the probable

annual need of each for the service of the other. This was deemed a fair balance between the two—agreed upon for their mutual convenience of settlement. The contract was made long before the tax was imposed, and we must treat it as having been the result of transactions of previous years, and justified by similar experiences of other railroads and telegraph companies. Such contracts between railroads and telegraph lines were and are very frequent. *Postal Telegraph Co. v. Tonopah Railroad Co.,* 248 U. S. 471. The payment of charges for telegrams or shipments, or other services, was a mere substitute for the payment of the money down, at the time each message was sent or each shipment made, or other service was performed. Certainly no one would say that, because a patron of the telegraph company paid his bills once a year, it rendered them free from taxation. The arrangement here is not substantially different. The payment for the messages, i. e., the charge for them, to satisfy the statute, should be money or money's worth; and that is what we think this contract in its ultimate and general result amounted to.

Some elaborate arguments have been made against this conclusion. The Circuit Court of Appeals' view was that this was a mere swapping of free privileges and was not a service for a money charge. We do not think the privileges were free. We think that the one for messages was set off against the one for transportation, and that the one paid for the other.

The counsel for the respondent insist that our decision in *Postal Telegraph Co. v. Tonopah Railroad Co., supra,* is inconsistent with our present conclusion. That case concerned the right of telegraph companies to recover against railroad companies for telegraph messages, on contracts like the one here in question. The defense was, that such contracts for an exchange of service, while valid

under the Interstate Commerce law for messages and transportation on or along the line, were invalid as to messages or transportation service beyond the railway lines.   The Interstate Commerce Commission had held that such extras must be charged for by the railroad upon the basis of its published rates, and by the telegraph company upon reasonable rates as charged to other customers for similar service.   It arose under the amendment to the Interstate Commerce Act of June 18, 1910, c. 309, § 7, which, in bringing in under the interstate commerce law telegraph and telephone and cable companies, provided "that nothing in the act shall be construed to prevent telephone, telegraph and cable companies from entering into contracts with common carriers for the exchange of services."   It was held that this proviso was general enough to allow an exchange of services off the lines as well as services on them.   The Court said that the railroad and telegraph had grown together in mutual dependence, and that contracts of this sort for long terms had been nearly universal for fifty years; that as it was feared that such contracts would be unlawful if the telegraph companies were brought within the law, the amendment of 1910 was passed.   This Court's conclusion was that, under the contract, all the great benefits on one side were consideration for all those conferred upon the other, and that Congress probably allowed the exchange because it had been frequently advised by the Commission that full performance of the exchange would not affect any public or private interest adversely.   Speaking of the meaning of exchange, the Court said (p. 474): .

"But 'exchange' is a barter and carries with it no implication of reduction to money as common denominator.   It contemplates simply an estimate, determined by self interest, of the relative value and importance of the services rendered and those received.   This is admitted with regard to services on the line, and if so whatever

services can be exchanged, can be exchanged in the same
way."

This language is thought to show that the use of trans-
portation service as a consideration for telegraphic mes-
sages could not properly be regarded as the equivalent of
a money payment necessary to meet the requirement of
§ 500 as a basis of taxation. We do not think the case or
the language quoted apposite. The Court in the opinion
cited was merely deciding what the general expression
" exchange of services " meant, and whether it must be
narrowly, meticulously and rigidly construed, exactly to
conform to the general rule that all rates of tariff on the
same class of service should be uniform. The Court was
merely pointing out that in allowing a general exchange of
service between two such partners as a railroad and a tele-
graph company, Congress did not intend to enforce the
uniformity rule strictly and require a nice mathematical
or monetary equivalence between the exchanged services.
The issue here is different. It concerns a tax upon tele-
graph messages paid for by transportation, and the ques-
tion is whether such payment is a charge which can be
measured, or measures itself, in money. The most signifi-
cant evidence that it is, appears in the conduct of the
parties themselves, for in their exchange of such services
they make actual payments to each other in money above
a certain amount of business, which amount itself they
determine by a carefully kept account of actual services in
money figures.

A lengthy argument is made that the Revenue Act and
the Interstate Commerce Act are *in pari materia,* and
therefore that the word " charge " in the Revenue Act
should be controlled by the meaning of the same word in
interstate commerce legislation, which it is said could
not be satisfied by a mere exchange of service. We think
this is a far cry to the proper meaning of § 500 in imposing
a tax, and do not think its correct interpretation is thus
assisted.

Then it is said that paragraph (c) of § 501 of the Act of 1918 prevents the imposition of this tax. That paragraph is as follows:

"(c) The Taxes imposed by section 500 shall apply to all services or facilities specified in such section when rendered for hire, whether or not the agency rendering them is a common carrier. In case a carrier (other than a pipe line) principally engaged in rendering transportation services or facilities for hire does not, because of its ownership of the goods transported, or for any other reasons, receive the amount which as a carrier it would otherwise charge, such carrier shall pay a tax equivalent to the tax which would be imposed upon the transportation of such goods, if the carrier received payment for such transportation, such tax, if it can not be computed from the actual rates or tariffs of the carrier, to be computed on the basis of the rates or tariffs of other carriers for like services as determined by the commissioner. In the case of any carrier (other than a pipe line) the principal business of which is to transport goods belonging to it on its own account and which only incidentally renders service for hire, the tax shall apply to such services or facilities only as are actually rendered by it for hire. Nothing in this or the preceding section shall be construed as imposing a tax (1) upon the transportation of any commodity which is necessary for the use of the carrier in the conduct of its business as such and is intended to be so used or has been so used; or (2) upon the transportation of company material transported by one carrier, which constitutes a part of a railroad system, for another carrier which is also a part of the same system."

Regulation No. 49 issued by the Internal Revenue Department to carry out this paragraph was as follows:

" If a telegraph or telephone line or lines along the line of any railroad company be necessary for the use of such railroad company in the conduct of the railroad company's business as such, and if the railroad company, under con-

tract transports commodities necessary to maintain or operate such telegraph or telephone line or lines along the line of such railroad company, such commodities being intended to be, or having been so used, and the railroad company makes no charge for such transportation, the charges which, but for such arrangement, would have accrued upon such transportation are exempt from the tax."

Paragraph (c) of § 501 is only to be found in the Revenue Act of 1918, and could not affect the validity of any taxes at issue in this case after August, 1922, when the Revenue Act of 1921 became applicable. In the next place, paragraph (c), with the enforcing regulation No. 49, has no application to the payment of taxes on telegraph messages. It is dealing with the transportation of goods and commodities by common carriers and the tax on rates received from their carriage. The words used make this interpretation necessary, and it is supported by the fact that, when in the Revenue Act of 1921 the taxes on freight and express shipments were repealed, this paragraph (c) was also repealed, though the tax on telegraph messages was retained.

It is true that this result leaves a tax on the telegraph messages in the exchange of services, and exempts receipts on the transportation side of the exchange. But Congress did not fix its taxes with reference to the particular phase of this contract by which charges for messages are balanced against those for transportation, and doubtless had satisfactory reasons for exempting the one and not the other. The difference furnishes no ground for varying the meaning and scope of § 500 (f), or its application to the telegrams which were exchanged for the exempted transportation.

For the reasons given, the judgment of the Circuit Court of Appeals is reversed and the judgment of the District Court is restored.

*Reversed.*