## ERIE R. CO. v. UNITED STATES.

### No. K–547.

Court of Claims.

Dec. 7, 1931.

Marion B. Pierce, of New York City, for plaintiff.

Charles B. Rugg, Asst. Atty. Gen. (Joseph H. Sheppard and Charles T. Hendler, both of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and WHALEY, WILLIAMS, LITTLETON, and GREEN, Judges.

WHALEY, Judge.

The plaintiff brings this suit to recover $52,156.60, with interest, paid by it as excise

taxes on the transmission of telegraphic messages. The defendant demurs to the amended petition on the ground that the petition does not set forth a cause of action against the United States. In considering the demurrer, the material allegations of the amended petition are assumed to be admitted as true.

The plaintiff was a corporation organized under the laws of the state of New York, and was, during the period involved, operating a system of railroads in several states. In conducting its business, the plaintiff had many telegraphic messages transmitted for it by the Western Union Telegraph Company under the terms of a contract for a mutual exchange of services. The excise taxes on the transmission of the telegraph messages were assessed against and paid by the plaintiff under the provisions of subdivision (f) of section 500 of the Revenue Act of 1918, and subdivision (a) of section 500 of the Revenue Act of 1921 (provisions of both statutes being identical), for the period between January, 1921, and June, 1924. The plaintiff duly filed claims for refund which were rejected by the Commissioner of Internal Revenue.

It is only necessary to insert the pertinent parts of the statute of the Revenue Act of 1918, 40 Stat. 1057, 1101, as the Revenue Act of 1921, 42 Stat. 227, 284, is identical in its provisions:

"Sec. 500. That from and after April 1, 1919, there shall be levied, assessed, collected, and paid, in lieu of the taxes imposed by section 500 of the Revenue Act of 1917—* * *

"(f) In the case of each telegraph, telephone, cable, or radio, dispatch, message, or conversation, which originates on or after such date within the United States, and for the transmission of which the charge is more than 14 cents and not more than 50 cents, a tax of 5 cents; and if the charge is more than 50 cents, a tax of 10 cents. Provided, That only one payment of such tax shall be required, notwithstanding the lines or stations of one or more persons are used for the transmission of such dispatch, message, or conversation; and

"(g) A tax equivalent to 10 per centum of the amount paid after such date to any telegraph or telephone company for any leased wire or talking circuit special service furnished after such date. This subdivision shall not apply to the amount paid for so much of such service as is utilized (1) in the collection and dissemination of news through the public press; or (2) in the conduct, by a common carrier or telegraph or telephone company, of its business as such. * * *

"Sec. 501. (a) That the taxes imposed by section 500 shall be paid by the person paying for the services or facilities rendered. * * *

"(c) The taxes imposed by section 500 shall apply to all services or facilities specified in such section when rendered for hire, whether or not the agency rendering them is a common carrier. * * * *"

Article 9 of Regulations No. 57 is, in part, as follows:

"Art. 9. *Messages transmitted under contract.*—Where, by contract, a telegraph, telephone, radio, or cable company agrees, in consideration of the payment of a lump sum or of the performance of services, to transmit messages on frank, such messages are subject to the tax imposed by this section (500 (a) of the act. The tax on each such message is to be computed upon the amount of the regular established charge for the transmission of similar messages for ordinary customers, calculated at the regular fixed rate provided in the tariffs of the transmitting carrier. The questions as to whether such messages relate to the operation of the business of a common carrier and whether they are 'on line' or 'off line' are immaterial. Thus, a telegraph company agrees to transmit over its lines on a railroad line all messages relating to railroad business 'free' and all such messages over its lines off the railroad lines 'free' to an amount not exceeding $10,000 per year calculated at its regular rates, and all messages over that amount at half rates, in consideration of services to be performed by the railroad in the transportation of men and materials of the telegraph company. All such messages, whether 'on line' or 'off line,' and whether 'free' or at half rates, are subject to the tax provided by this section (500 (a) of the act. The tax must be computed, collected, and paid upon each such message. * * * *"

The contract is dated September 25, 1907, and commenced to run on October 1, 1907, ending September 30, 1928. The material provisions of the contract for our consideration are set forth in the fourth and fifth paragraphs, and are as follows:

"Fourth. All messages of the railroad company, and of its officers, employees and agents, pertaining to its business, shall be transmitted free of charge by railroad operators on the wires set apart for said business, between all telegraph stations, offices or other buildings of the railroads covered by this agreement.

"The telegraph company agrees to issue or cause to be issued to such officials of the railroad company, and of its own subsidiary railroad, coal, transportation and steamboat companies, and of its own freight and transportation lines, as may be designated by the president, vice president or general manager of the railroad company, annual franks authorizing the transmission of messages signed by such officials, and answers thereto, relating strictly to the business of the railroad company and its subsidiary companies, originating at or destined to points on the telegraph company's lines in the United States and Canada, either on or off the line of said railroads.

"The tolls on all such messages shall be calculated at 55.47 per cent. of the regular commercial day rates of the telegraph company between points where such messages originate and points to which destined, and charged to the railroad company in one account to be settled for as hereinafter provided. No charge shall be made for any message between points on the lines of the railroads at any time covered by this agreement, but if sent between the telegraph company's independent offices such messages shall be charged up to the railroad company. Settlements of all accounts between the parties hereto shall be made annually.

"The telegraph company agrees that in each and every year during the continuation of this agreement it will furnish to the railroad company freight traffic of the kind described in subdivision (C) of article fifth, to such an amount that the earnings of the railroad company thereon at its regularly established rates shall not be less than the amount charged by the telegraph company against the railroad company for telegraph messages in the same year as above provided. The telegraph company further agrees that in case of its failure so to do its charge for telegraph service for the railroad company and its subsidiary companies in such year shall be reduced to the gross earnings of the railroad company upon such freight traffic of the telegraph company.

"It is understood and agreed that the telegraphic service under franks herein provided for applies only to the transmission of messages concerning the operations and business of the railroad company, and shall not be extended to any messages for transmission by ocean cable, and shall not be so used by the railroad company as to compete with the telegraph company.

"In the use of said franks by the freight and transportation lines aforesaid the railroad company shall pay, or cause to be paid, to the telegraph company as herein provided, the amounts chargeable to other interests than the railroad company, as determined by the railroad company; statements of such freight and transportation lines' telegraphic service to be rendered separately by the telegraph company to the railroad company monthly.

"It is further agreed that messages sent upon business of freight and transportation lines, in which the railroad company has a minor interest, other than those hereinbefore mentioned in this section, shall to the extent of such interest, be deemed to be upon the business of the railroad company and subject to the provisions in respect to such business herein contained; and any charges made by the telegraph company upon business of such freight or transportation lines shall, to the extent they are charged by said lines to the railroad company, or to the extent of the proportion of the railroad company's ownership in such lines, be refunded to the railroad company and the amount thereof charged to the railroad company's account.

"Fifth. The railroad company, so far as it lawfully may, agrees (A) to issue to the general officers of the telegraph company, annual passes authorizing their transportation over the railroads covered by this agreement, when traveling on the business of said telegraph company covered thereby.

"(B) to transport over all such railroads, upon application of a superintendent or other general officer of the telegraph company, all persons in the employ of the telegraph company, when traveling on such business of said company, and to transport over such railroads, including train service for distribution wherever required along any of said railroads, all poles, wire, cross-arms and other material and supplies of the telegraph company for the construction, maintenance, operation, repair and reconstruction of the lines and wires upon and along such railroads, and of such additional wires and lines of poles and wires as may be erected under the provisions of this agreement; and also to so transport all supplies for the establishment, equipment, maintenance and operation of the telegraph offices of the telegraph company and the railroad company, at places along and adjacent to, or at the termini of said railroads, and also old material from the offices and lines along said railroads returned to the telegraph company's supply department. It being clearly understood that the transportation outlined does not cover any material for the building, repairs or renewal

of any telegraph line not on the line of said railroads, nor for the offices of such line, nor for any offices unless the mains leading from them run along the railroads covered by this agreement; and

"(C) to transport the telegraph company's poles, wires, cross-arms and its other material and supplies over any or all the railroads covered by this agreement, to be used beyond or off the line of all such railroads, and that all the transportation covered by this paragraph C shall be charged up by the railroad company to the telegraph company's account at regular current, through or local transportation rates, as the case may be, and settlements made therefor annually as above provided in the fourth article of this agreement.

"All passes or transportation in any form granted by said railroad company, at the request of said telegraph company, shall be subject to the railroad company's usual contract releasing it from all liability for any injury to the person or for any loss or injury to the property of the person to whom passes or transportation may be issued, whether such injury or loss shall be caused by the negligence of the railroad company itself, its agents or servants, or otherwise."

It will be seen from the terms of the contract set out above that each year the telegraph company will give to plaintiff freight business which at tariff rates will equal in volume 55.47 per cent. of the commercial day rate of the telegraph business given by plaintiff to the telegraph company, and, in case the telegraph business exceeds the freight business, there will be no charge for the excess.

The plaintiff contends that (1) there being a mere exchange of services, no money passing from one to the other, there is no charge upon which the excise tax can be computed, and therefore it is not assessable; (2) that in any event the excise tax should not exceed that based on 55.47 per cent. of the commercial rates, the Commissioner of Internal Revenue having made his assessment at 100 per cent. of the commercial rate.

■ Contracts for the exchange of services between railroad and telegraph companies involving practically the same question now presented have been before the courts on several occasions. The material question to be decided is whether the services rendered under this contract were computed in money or on a monetary basis. It is true that no money was actually passed in the exchange, but the exchange of services each year was calculated on the full tariff rates as to the freight business of the railroad, and as to the telegraph business at the full public rate, and then reduced to 55.47 per cent. of the commercial rates.

In Hellmich v. Missouri Pacific, 273 U. S. 242, 254, 47 S. Ct. 395, 399, 71 L. Ed. 628, there was also an exchange of services between the railroad and the telegraph company, except that the excess of one business over the other, freight over telegraph, or vice versa, with certain immaterial exceptions, was to be paid at public rates. The question there was, as stated by the court, whether the payment of the telegraph messages by transportation was "a charge which can be measured, or measures itself, in money." (The same statutes were under consideration in that case as are involved in the instant case.) The court said: "The most significant evidence that it is, appears in the conduct of the parties themselves, for in their exchange of such services they make actual payments to each other in money above a certain amount of business, which amount itself they determine by a carefully kept account of actual services in money figures."

The only difference between this case and the Hellmich Case is that in the latter case money actually passed in the settlement. In the instant case no money was passed between the parties, but the services rendered to the railroad company by the telegraph company were computed in money on the basis of the commercial rate for the general public, and reduced to a percentage, and the services of the railroad company were likewise computed on the published tariff rate in money, and, if not equal to the total amount for services rendered by the telegraph company on the fixed percentage basis, the latter still further reduced the percentage to a sum equal to the amount found due to the railroad company. Money, or its equivalent, is the underlying basis of the method of arriving at the value of the respective services and the exchange thereof. The rendition of each act of service is first ascertained on the commercial public rates of the respective carriers. We can see no difference between the contract in the Hellmich Case and the contract in the instant case.

■ The plaintiff contends that, if the excise tax is assessable, it should be computed, not at the commercial rate for telegraph services, but at 55.47 per cent. of the commercial rate, as called for in the contract.

In Western Union Telegraph Company v. Delaware, L. & W. R. Co. (D. C.) 282 F.

925, 931, considering a similar contract for exchange of services, the court said:

"Giving reasonable scope to the legislative intent, the act, in my judgment, must be construed to cover all messages transmitted for an economic consideration—money or money's worth. It is difficult under a sound taxing policy to find a basis for differentiation between exchanges and cash-paid services."

The Treasury Department issued article 9, Regulations 57, as an aid in the administration of the excise tax herein assessed. That regulation provides, among other things:

"The tax on each such message is to be computed upon the amount of the regular established charge for the transmission of similar messages for ordinary customers, calculated at regular fixed rate provided in the tariffs of the transmitting carrier."

The Supreme Court held that this regulation was proper to carry out the statute with reference to such a contract as was involved in the Hellmich Case. The plaintiff's contract must be construed to provide for the payment of messages in money's worth, and the regulation promulgated by the Treasury Department is appropriate also to plaintiff's contract.

The same regulation was under consideration in the Western Union Telegraph Company v. Delaware, L. & W. R. Co., supra, and the court held:

"The regulation issued by the Commissioner seems to comport with the general tenor of the act, and the record and arguments advanced before me do not indicate that it is unreasonable as applied to the present controversy. In cases of this kind, administrative rulings made by the department, after careful consideration of the problem as it affects the country as a whole, ought not lightly to be disturbed by the courts."

Considering a similar contract and construing the same regulation, Judge Hand said in Delaware, L. & W. R. Co. v. Bowers (D. C.) 28 F.(2d) 33, 35:

"It is clear that the franked messages are not transmitted by the telegraph company for the benefit of the railroad without compensation, but in each case are in exchange for some valuable consideration. They are not, to be sure, paid in cash. I have had no little difficulty in arriving at a valuation for the messages, but there is a charge in fact made, and the method adopted by the departmental regulation fixing the value of the service is not unreasonable. The amount ordinarily charged to the public seems a fair measure of the worth of the service."

The regular established charge for the public represents the amount upon which the tax is to be computed. United Cigar Stores Co. v. United States, 50 F.(2d) 466, 72 Ct. Cl. ——, decided by this court June 1, 1931; United Profit Sharing Corp. v. United States (Ct. Cl.) 43 F.(2d) 266; and Colgate & Co. v. United States, 66 Ct. Cl. 510.

The Commissioner was correct in assessing the excise tax upon the regular commercial rate as published by the telegraph company. The petition does not state a cause of action, and should be dismissed. It is so ordered.