CONTINENTAL TRAILWAYS, INC., INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE, PLAINTIFF-RESPONDENT, v. DIRECTOR, DIVISION OF MOTOR VEHICLES, DEFENDANT-APPELLANT.

Argued November 19, 1985—Decided May 27, 1986.

*Martin L. Wheelwright,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Joseph T. Wilkins* argued the cause for respondent.

The opinion of the Court was delivered by

GARIBALDI, J.

The primary issue in this case is whether the autobus excise tax imposed under *N.J.S.A.* 48:4–20 discriminates against interstate commerce in violation of the commerce clause of the United States Constitution, U.S. Const. art. 1, § 8, cl. 3. If the excise tax is unconstitutional, a secondary issue arises as to whether the plaintiff-respondent, Continental Trailways, Inc. (Continental), has a right to a refund. Both the Tax Court and the Appellate Division held that the excise tax was unconstitutional and ordered a refund. Because this case involves a substantial question arising under the Constitution of the United States, the defendant-appellant, the Director, Division of Motor Vehicles (Director), appealed as a matter of right to this Court.

I

The autobus excise tax provision, *N.J.S.A.* 48:4–20, was originally enacted in 1934, *L.*1934, *c.* 68. Its forerunner was enacted in 1927 (*L.*1927, *c.* 184), accompanied by the following statement of purpose:

> This bill imposes an excise on the use of highways of the State by motor vehicles used for carrying passengers or property for hire in interstate commerce. The purpose is to compel such vehicles to bear their just share of taxation. At the present time such vehicles pay nothing to the State of New Jersey, except the registration fees provided for under the Motor Vehicle Act, while other vehicles operating wholly within the State are subject to taxation. The right to impose such a tax on such vehicles engaged in interstate commerce has been recently upheld by the Federal courts. [*quoted in Safeway Trails, Inc. v. Furman*, 41 *N.J.* 467, 478 (1964), appeal dismissed, 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964).]

The purpose of the statute therefore was to require interstate buses to pay for the privilege of using state highways, in effect to compensate the State for their share of the cost of constructing and maintaining the highways and of administering the motor vehicle laws. *Safeway Trails, Inc. v. Furman*, 41 *N.J.* 467, 478 (1964).

The version of *N.J.S.A.* 48:4–20 at issue, as amended by *L.* 1972, *c.* 211, § 2, effective December 31, 1972, retains essentially the same purpose. It reads:

Every person owning or operating an autobus which is operated over any highway in this state for the purpose of carrying passengers *from a point outside the state to another point outside the state,* or *from a point outside the state to a point within the state,* or *from a point within the state to a point outside the state* shall pay to the Director of the Division of Motor Vehicles, as an excise for the use of such highway, ½ cent for each mile or fraction thereof such autobus shall have been operated over the highways of this state, *except that no excise shall be payable for the mileage traversed in regular route passenger service* provided under operating authority conferred pursuant to *R.S.* 48:4–3. (Emphasis added.)

Thus, *N.J.S.A.* 48:4–20 still exacts an excise tax for each mile of autobus [1] (bus) operations on the highways of New Jersey in connection with the interstate transport of passengers. No tax, however, is payable for intrastate mileage traversed in regularly-scheduled passenger service provided under the authority of the Public Utilities Commission (P.U.C.).[2]

The facts are undisputed. Continental is a major common-carrier providing both interstate and intrastate bus service by means of regular-route-passenger (regular route) operations and charter operations through wholly-owned subsidiaries. During the period in issue, November 1977 to June 1979, Continental's interstate operations were provided under authority conferred by the Interstate Commerce Commission (I.C.C.) and its intrastate operations were provided under authority conferred by the P.U.C. Continental also held P.U.C. approval for the intrastate service it provided in conjunction with I.C.C.-approved interstate routes.

For several years prior to June 1979, Continental filed monthly business-excise-tax returns with the Director for payment of the excise tax imposed under *N.J.S.A.* 48:4–20. In those reports, Continental computed its tax on the basis of the total

---

[1]"Autobus," as used in both *N.J.S.A.* 48:4–20 and *N.J.S.A.* 48:4–3, is defined in *N.J.S.A.* 48:4–1 as any motorbus operated over public highways or public places in this State for the transportation of passengers for hire in intrastate business, notwithstanding that such bus also may be used in interstate commerce.

[2]*N.J.S.A.* 48:4–3 provides that no bus operation engaged wholly or partially in intrastate commerce shall be operated or run in New Jersey without securing the approval of the Board of Public Utility Commissioners (P.U.C.). The Board of Public Utility Commissioners became the Board of Public Utilities under *N.J.S.A.* 52:27F–6, *L.*1977, *c.* 146, § 5.1, effective July 11, 1977.

number of miles traversed in New Jersey. It did not exempt from its calculation the New Jersey miles traversed in regular route service under the authority of the P.U.C. In November 1979, when Continental realized that it had not excluded this exempt mileage, it filed a claim for refund. The Division of Motor Vehicles (D.M.V.) advised Continental that no refund was permitted, but that its overpayment could be used to offset future taxes in the three months following the end of the applicable tax month. Continental then filed a complaint with the Tax Court on June 9, 1980, seeking a refund of $55,392.64.

During the period for which the refund claim was made, Safeway Trails, Inc., one of plaintiff's wholly-owned subsidiaries, operated seven interstate routes into, through, and out of New Jersey. For each of the routes Safeway Trails, Inc. held I.C.C. operating authority for the interstate service as well as P.U.C. approval for the intrastate service. Hence, Continental held the necessary P.U.C. authority whenever it provided bus passenger service strictly between points within New Jersey. However, whenever the bus passenger service related to the transport of passengers only between points outside this State and points within New Jersey, or only between points outside this State and included no service to New Jersey points, Continental held only I.C.C. approval.

Continental concedes that its charter miles [3] are taxable. The Director concedes that scheduled intrastate miles for which there is P.U.C. authority either (i) point-to-point in New Jersey as an exclusively intrastate trip, or (ii) point-to-point in New Jersey as part of an interstate trip are not taxable. The conflict between the parties specifically concerns the tax to be

---

[3]The Tax Court defined charter operations to constitute service in which groups of patrons charter or lease buses and drivers for transportation to certain locations designated by the group for a fixed price per trip. *Continental Trailways v. Motor Vehicles Div. Director*, 6 *N.J.Tax* at 42, 46 (1983).

imposed under *N.J.S.A.* 48:4–20 on interstate miles, for which there is I.C.C. authority either (1) from a point in New Jersey to a point outside New Jersey or vice versa, or (ii) from one point outside New Jersey to another point outside New Jersey, with mileage traversed in New Jersey by going through the state. D.M.V. alleges that such mileage is taxable. Continental contends that taxing such mileage is an unconstitutional burden on interstate commerce.[4]

The Tax Court held that the excise tax imposed by *N.J.S.A.* 48:4–20 on interstate miles, in the absence of a "complementary" tax on intrastate miles, unconstitutionally discriminated against interstate commerce in violation of the commerce clause, and was therefore void. It also ordered the D.M.V. to repay "all bus excise taxes paid from November 1977 to June 1979, except ... taxes on charter bus miles." The Appellate Division affirmed the Tax Court's determination that the statute unconstitutionally burdened interstate commerce, but vacated the order to refund the taxes with interest. Retaining jurisdiction, it remanded the case to the Tax Court so that the parties could agree on the method and terms of a credit for the overpaid taxes. When the parties advised the Tax Court that a credit was impractical, the Tax Court ordered D.M.V. to pay the refund, together with interest. The Appellate Division affirmed the order, 201 *N.J.Super.* 257. We affirm the judgment of the Appellate Division insofar as it holds that *N.J.S.A.* 48:4–20 unconstitutionally discriminates against interstate commerce, but reverse insofar as it orders a refund.

---

[4]At trial, Continental also argued that the tax was a denial of the equal protection clause of the fourteenth amendment. The Tax Court held that "[I]n view of the determination reached on the discriminatory nature of the tax in violation of the Commerce Clause, it is not necessary to deal with plaintiff's equal protection argument." Continental did not raise the equal protection argument in the briefs that it submitted to the Appellate Division or to this Court. Instead, it chose to rely on the lower court opinions that focused only on the commerce clause.

## II

In 1964, we held the earlier version of the excise tax [5] on interstate bus service to be constitutional because there was a complementary tax on intrastate service. *Safeway Trails, Inc. v. Furman*, 41 *N.J.* 467 (1964).

In *Safeway*, the plaintiff-bus company also argued that the excise tax on mileage traveled by interstate buses unlawfully burdened interstate commerce. However, as part of the then-existent statutory scheme intrastate carriers were also taxed for the use of the highways. The Legislature had enacted *N.J.S.A.* 48:4–14, which imposed a "3% of gross receipts ... monthly franchise tax for revenues for the use of streets" upon intrastate operators. In the absence of proof that the interstate excise tax resulted in a heavier financial burden than the intrastate excise tax, we held the latter tax did not discriminate against interstate commerce.[6] The Court concluded that a tax

---

[5]When *Safeway* was decided, *N.J.S.A.* 48:4–20 was virtually identical to its present version. It read as follows:

Every person owning or operating an autobus which is operated over any highway in this State for the purpose of carrying passengers from a point outside the State to another point outside the State, or from a point outside the State to a point within the State, or from a point within the State to a point outside the State shall pay to the Director of the Division of Motor Vehicles, as an excise for the use of such highway, ½ cent for each mile or fraction thereof such autobus shall have been operated over the highways of this State, *except that no excise shall be payable for the mileage traversed in any municipality to which such owner or operator has paid a monthly franchise tax for the use of its streets under the provisions of section 48:4–14 of this Title.*

The italicized language above represents the Legislature's changes in *N.J.S.A.* 48:4–20 from the time when *Safeway* was decided and to the version of the statute at issue in this case.

[6]The U.S. Supreme Court previously recognized the importance of complementary taxes. In *Interstate Buses Corp. v. Blodgett*, 273 *U.S.* 245, 48 *S.Ct.* 230, 72 *L.Ed.* 551 (1928), a Connecticut statute imposed a tax of one cent for each mile of highway traversed by a motor vehicle used in interstate commerce. The tax was challenged by a Connecticut bus company engaged in interstate commerce between Connecticut and other New England states. Connecticut also imposed a tax on all companies engaged in intrastate bus transportation of

levied on interstate commerce is not discriminatory, merely because the tax differs in form, or adopts a different measure of assessment, from that imposed on intrastate carriers. *Id.* at 489.

In 1972, however, the complementary gross receipts tax imposed on intrastate carriers under *N.J.S.A.* 48:4–14 was repealed, effective December 31, 1972, *L.*1972, *c.* 211, § 6. As part of the legislation, *N.J.S.A.* 48:4–14 was amended to its present form to exempt "mileage traversed in regular route passenger service provided under operating authority conferred pursuant to *R.S.* 48:4–3" and to delete reference to the gross receipts tax. *L.*1972, *c.* 211, § 2. The entire legislative package was introduced in Senate Bill No. 1151. The purpose of the legislation, as set forth in the Statement to Senate Bill 1151, was as follows:

> The purpose of this bill is to assist bus companies which provide regular route bus service to New Jersey residents.
>
> [M]any of these companies have suffered serious financial losses in the past few years. The potential for loss has forced these companies to apply for rate increases and curtailment of present services.
>
> Mindful that increased rates and curtailment of service will only worsen the financial picture for regular route bus companies because it will force bus patrons to seek other transportation, this bill revises and repeals parts of the statutory law to reduce the taxes and other fees which these companies pay, thereby relieving part of the financial burden of these public transportation oriented companies.

Through this bill, the Legislature removed the complementary tax on intrastate commerce, thereby providing an indirect subsidy to intrastate carriers, in an attempt to ameliorate their serious financial plight in 1972.[7] No complementary tax has

---

three percent of their gross receipts, less certain limited deductions. The Supreme Court in upholding the statute held that the two taxes "are complementary in the sense that ... one affects only interstate and the other only intrastate commerce." 273 *U.S.* at 251, 48 *S.Ct.* at 231, 72 *L.Ed.* at 554.

7Serious problems facing private bus companies providing intrastate bus transportation were recognized as early as 1966 when the former Commuter Operating Agency in the Department of Transportation was established by *L.*

been reimposed on the operation of buses in intrastate commerce since then. To recapitulate, we therefore have the following tax treatment of interstate and intrastate mileage:

1. The bus excise tax *is not imposed* upon bus operators who provide regular-route service under P.U.C. authority point-to-point in New Jersey as an exclusively intrastate trip. Nor is the tax imposed upon interstate operators, whether they be domestic or out-of-state, for any mileage traversed point-to-point within New Jersey, as part of an interstate trip.

2. The excise tax, however, *is imposed* upon both domestic and out-of-state interstate bus operators for all *other* mileage traversed within New Jersey. This is mileage traversed *solely* in trips involving one point in New Jersey, to a point outside of New Jersey, or involving a point outside New Jersey to another point outside New Jersey by traveling through this state. For example, if an interstate operator has an interstate run from Philadelphia to New Jersey four times a day, the operator is subject to the tax for all the traversed New Jersey miles. However, if two of these four trips include new stops in Trenton and Jersey City at which P.U.C. has authorized that passengers be picked up and discharged within New Jersey, then the corresponding miles are exempt from the tax.[8]

---

1966, *c.* 301, ¶ 15–27 (*N.J.S.A.* 27:1A–16(a), repealed by *L.*1979, *c.* 150 ¶ 28). The Commuter Operating Agency suggested other responses in its 1969 report to then-Governor Hughes, "Buses: Crisis and Responses."

[8]On June 27, 1985, an amendment to *N.J.S.A.* 48:4–20, to take effect sixty days following enactment, was approved. *L.*1985, *c.* 207.

As amended, this bill amends existing law to provide that a person owning or operating interstate regular route commuter bus service shall be exempt from the one-half cent per mile excise tax currently paid on mileage traversed on New Jersey highways. In addition, any bus carrier under contract with New Jersey Transit or under contract with a county for special rural bus transportation subject to New Jersey Transit shall also be exempt. Under existing law, intra-State regular route bus service and New Jersey Transit are exempt from the bus excise tax. [Senate Revenue, Finance and Appropriations Committee Statement, Senate No. 131–*L.* 13985 *c.* 207.]

## III

A state tax is not *per se* invalid because it burdens interstate commerce. *Complete Auto Transit, Inc. v. Brady,* 430 *U.S.* 274, 279, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326 (1977). A state may impose a reasonable tax upon interstate carriers that use its highways so long as that tax does not discriminate against interstate commerce. *Capital Greyhound Lines v. Brice,* 339 *U.S.* 542, 70 *S.Ct.* 806, 94 *L.Ed.* 1053 (1950); *Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467 (1964).

In *Complete Auto Transit, Inc.,* the United States Supreme Court set forth a four-part test to measure the validity of a tax against a commerce clause challenge. The Court concluded that a state tax *per se* does not unconstitutionally burden interstate commerce if: (1) there is a sufficient nexus with the taxing state; (2) the tax is fairly apportioned to local activities and does not result in multiple burdens being placed on the taxpayer; (3) the tax does not discriminate against interstate commerce; and (4) the tax is fairly related to the services and benefits provided by the taxing state to the taxpayer.

The excise tax meets requirements one, two, and four, and they are not at issue.[9] The primary issue in this case is number

No reason for the exemption is set forth in the legislative history. By exempting from the bus-excise tax "regular route commuter bus service from a point within the State to a point outside the State, or from a point outside the State to a point within the State," the amendment exacerbates the discriminatory effect of the Act on interstate bus carriers providing regular route operations, which remain subject to the excise tax.

[9]The Supreme Court has noted that an obvious nexus exists when the taxed activity is conducted within the state. *Department of Revenue v. Association of Washington Stevedoring Cos.,* 435 *U.S.* 734, 750, 98 *S.Ct.* 1388, 1399, 55 *L.Ed.*2d 682, 697 (1979). The excise tax at issue is imposed only on miles traversed solely in New Jersey over New Jersey highways. In addition, apportionment based on mileage is among the "reasonable [bases] for apportionment of an excise tax upon interstate carriers which use the highways." *Capital Greyhound Lines v. Brice,* 339 *U.S.* 542, 70 *S.Ct.* 806, 94 *L.Ed.* 1053. There is no allegation here that the tax results in multiple taxation of the same activity. Finally, an excise tax to maintain the highways is fairly related to the services

three: whether the taxing scheme discriminates against Continental and similar interstate bus companies in violation of the commerce clause.[10]

■■ The commerce clause, of its own force, protects free trade among the states. *Armco Inc. v. Hardesty*, 467 *U.S.* 638, —, 104 *S.Ct.* 2620, 2622, 81 *L.Ed.*2d 540, 545 (1984); *Boston Stock Exch. v. State Tax Comm'n*, 429 *U.S.* 318, 328, 97 *S.Ct.* 599, 606, 50 *L.Ed.*2d 514, 523 (1977); *Freeman v. Hewit*, 329 *U.S.* 249, 252, 67 *S.Ct.* 274, 276, 91 *L.Ed.* 265, 271–72 (1946). One aspect of this protection is that a state "may not discriminate between transactions on the basis of some interstate element." *Boston Stock Exch.*, 429 *U.S.* at 332 n. 12, 97 *S.Ct.* at 608 n. 12, 50 *L.Ed.*2d at 526 n. 12. A tax does not discriminate against interstate commerce if it does not favor local interests to the disadvantage of interstate business.[11] *See*

---

and benefits, in this case use of the roadways, that the State provides to interstate bus carriers. *Capital Greyhound Lines v. Brice*, 339 *U.S.* at 544, 70 *S.Ct.* at 807, 94 *L.Ed.* at 1055; *Safeway Trails, Inc. v. Furman*, 141 *N.J.* at 486–87.

[10]We address D.M.V.'s argument that even if the tax is discriminatory, it is not *per se* unconstitutional. *See infra* at 543.

[11]The U.S. Supreme Court has spoken often on this issue. As far back as 1886, the Supreme Court stated:

A discriminating tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first mentioned State, is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States. [*Walling v. Michigan*, 116 *U.S.* 446, 455, 6 *S.Ct.* 454, 457, 29 *L.Ed.* 691, 694 (1886).]

The *Walling* Court feared that discrimination would interfere with interstate commerce by preventing "uniformity of regulation," *id.*, and interfering with the power granted to Congress. *Id.* at 459, 6 *S.Ct.* at 459, 29 *L.Ed.* at 695. In 1934, in *Baldwin v. Seelig*, 294 *U.S.* 511, 55 *S.Ct.* 497, 79 *L.Ed.* 1032 (1934), the Court held that the New York Milk Control Act, which set minimum prices to be paid by dealers to milk producers, was an unconstitutional burden on interstate commerce. *Id.* at 518, 55 *S.Ct.* at 498, 79 *L.Ed.* at 1036. In that case, Justice Cardozo expressly rejected the proposition that obstructions to competi-

*id.; Northwestern States Portland Cement Co. v. Minnesota,* 358 *U.S.* 450, 458, 79 *S.Ct.* 357, 362, 3 *L.Ed.*2d 421, 427 (1959).

In recent cases, the United States Supreme Court has struck down state tax statutes that aid local industry with taxes that impose greater burdens on commercial activities occurring partially outside of the state than on similar activities occurring solely within the state. *Maryland v. Louisiana,* 451 *U.S.* 725, 101 *S.Ct.* 2114, 68 *L.Ed.*2d 576 (1981) (Louisiana "first-use" tax on natural gas brought into the state unconstitutionally discriminates against interstate commerce.); *Boston Stock Exch. v. State Tax Comm'n,* 429 *U.S.* 318, 97 *S.Ct.* 599, 50 *L.Ed.*2d 514 (1977) (New York stock transfer tax that imposed a higher tax on stock transfers when the sale occurred outside of the state unconstitutionally discriminates against interstate commerce.); *Westinghouse Elec. Corp. v. Tully,* 466 *U.S.* 388, 404, 104 *S.Ct.* 1856, 1866, 80 *L.Ed.*2d 388, 401 (1984) (credit against New York franchise tax for gross receipts received from exports shipped from a regular place of business within New York discriminates against interstate commerce.); *Armco Inc. v. Hardesty,* 467 *U.S.* 368, 104 *S.Ct.* 2620, 81 *L.Ed.*2d 540 (1977) (West Virginia gross receipts tax for wholesale sales made by local manufacturers discriminates against interstate commerce.); *Bacchus Imports, Ltd. v. Dias,* 468 *U.S.* 263, 104 *S.Ct.* 3049, 82 *L.Ed.*2d 200 (1984) (Hawaii liquor tax unconstitutionally discriminates against interstate commerce.).

In *Maryland v. Louisiana,* 451 *U.S.* 725, 101 *S.Ct.* 2114, 68 *L.Ed.*2d 576, the Court held that Louisiana's "first-use" tax—which imposed a tax on natural gas brought into the state while giving local users a series of exemptions and credits—violated the commerce clause because it "unquestionably discriminate[d] against interstate commerce in favor of local interests." *Id.* at 756, 101 *S.Ct.* at 2134, 68 *L.Ed.*2d at 602.

---

tion between the states may be justified as measures to assure the economic health of local industry.

First, under provisions of the tax itself, gas from the outer continental shelf to be used for certain purposes within Louisiana was exempted, but the same gas that was to pass through the state, in order to be used by competitive users in other states, was not. Second, certain credits given under Louisiana's severance tax had the effect of encouraging natural gas owners producing outer continental shelf gas to invest in mineral exploration and development within Louisiana, rather than to invest in further outer continental shelf development, or in production in other states. Finally, various Louisiana statutes substantially protected Louisiana users and consumers of outer continental shelf gas from the impact of the tax, but outer continental shelf gas moving out of state did not receive this protection. *Id.* at 756–58, 101 *S.Ct.* at 2134–35, 68 *L.Ed.*2d at 602–03.

The Court noted that even though further hearings might be required to provide a precise determination of the extent of discrimination, it was an insufficient reason to wait to declare the tax unconstitutional. "We need not know how unequal the tax is before concluding that it unconstitutionally discriminates." *Id.* at 760, 101 *S.Ct.* at 2136, 68 *L.Ed.*2d at 604.

Similarly, in *Boston Stock Exch. v. State Tax Comm'n*, 429 *U.S.* 318, 97 *S.Ct.* 599, 50 *L.Ed.*2d 514 (1977), the Court found a New York stock transfer tax that imposed a higher tax on stock transfers when the sale occurred outside of New York State than on stock transfers involving a sale within the State to be unconstitutional. The Court noted:

> The [Commerce] Clause protects out-of-state businesses from any discriminatory burden on their interstate commerce activities. Even if the tax is not now the sole cause of New York residents' refusal to trade on out-of-state exchanges, at the very least it reinforces their choice of an in-state exchange and is an inhibiting force to selling out-of-state; that inhibition is an unconstitutional barrier on the free flow of commerce.
>
> [*Id.* at 334 n. 13, 97 *S.Ct.* at 609 n. 13, 50 *L.Ed.*2d at 527 n. 13.]

Moreover, the Court stated that it did not "hold that a State may not compete with other states for a share of interstate commerce...." It continued: "We hold only that in the process of competition no State may discriminatorily tax the prod-

ucts manufactured or the business operations performed in any other State."[12] *Id.* at 337, 97 *S.Ct.* at 610, 50 *L.Ed.*2d at 529.

In the most recent case, *Bacchus Imports, Ltd. v. Dias*, 468 *U.S.* 263, 104 *S.Ct.* 3049, 82 *L.Ed.*2d 200 (1984), the Supreme Court held that the Hawaii liquor tax unconstitutionally discriminated against interstate commerce. The tax was enacted in 1939 to defray the increased costs of police and other services resulting from the increased consumption of liquor. *Id.* at ——, 104 *S.Ct.* at 3052, 82 *L.Ed.*2d at 205. As originally drafted, the tax was imposed on all liquor sold in Hawaii. In 1971, in an attempt to encourage the local liquor industry, the Hawaii Legislature granted a tax exemption for Okolehao, a brandy distilled from indigenuous plants. In 1976, it granted a similar exemption for fruit wine. *Id.*

The key question for the Court was how much effect on competition must a tax have before it violates the commerce

---

[12]This language was restated in *Westinghouse Elec. Corp. v. Tully*, where the Supreme Court held that the credit against the New York franchise tax for gross receipts received from exports shipped from a regular place of business within New York was discriminatory because the credit benefitted local commerce to the disadvantage of competing exports shipped from other states. In *Westinghouse* the State, like D.M.V., contended that even if the tax was discriminatory the burden that it placed on interstate commerce was not of constitutional significance. It argued that the credit was not intended to divert new activity into New York, but to prevent the loss of economic activity in the State. The State sought to classify the tax credit "as an indirect subsidy." 466 *U.S.* at 1856 n. 12, 104 *S.Ct.* at 388 n. 12, 80 *L.Ed.*2d at 388 n. 12. The Court rejected all of these arguments

In *Armco, Inc. v. Hardesty,* the Supreme Court again cited the language from *Boston Stock Exch.* in holding that an exemption in West Virginia's gross receipts tax for wholesale sales made by local manufacturers discriminated against competing out-of-state manufacturers who made wholesale sales in West Virginia. The State's major argument in that case was that the tax did not discriminate because the local manufacturer, although exempt from the gross-receipts tax, still paid a much higher manufacturing tax. The Court held that the two taxes were not complementary and added that a "state may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." 467 *U.S.* 638, ——, 104 *S.Ct.* 2620, 2622, 81 L.Ed.2d 540, 545 (1984).

clause. Hawaii's major contention was that the tax was not discriminatory because the local liquors did not compete with the out-of-state products. A similar argument is posed by D.M.V. here, that the bus excise tax is nondiscriminatory because there is no competition between the taxed goods (interstate bus mileage) and those exempted (intrastate bus mileage). *Id.* at ——, 104 *S.Ct.* at 3054, 82 *L.Ed.*2d at 207. Hawaii also argued that because Okolehao and pineapple wine constituted less than one percent of total liquor sales in Hawaii, they posed "no competitive threat to other liquors produced elsewhere and consumed in Hawaii." *Id.*

The Supreme Court rejected both of these arguments. It found that neither the small volume of sales of the local beverages nor the fact that the exempted liquors did not constitute a present "competitive threat" to other liquors determined whether competition existed between locally-produced and out-of-state beverages. Instead, the Court found that those factors went only to the extent of such competition. *Id.* at ——, 104 *S.Ct.* at 3055, 82 *L.Ed.*2d at 208. The Court concluded that "as long as there is *some* competition between the locally-produced exempt products and non-exempt products from outside the State, there is a discriminatory effect." *Id.* at ——, 104 *S.Ct.* at 3056, 82 *L.Ed.*2d at 209 (emphasis added).

Hawaii also contended for three other reasons that the Court should take a more practical and flexible approach to its case. First, because the liquor tax advanced legitimate state objectives. Second, because the tax did not patently discriminate against interstate commerce. And third, because the effect of the tax on interstate commerce was incidental. Hawaii concluded that only when legislation is motivated by simple economic protectionism should there be a strict rule of invalidity.

The Supreme Court rejected these arguments and found that the liquor excise tax did in fact constitute "economic protectionism," because it had both a discriminatory purpose and a discriminatory effect. The former it discerned from the Legis-

lature's stated intent to aid the Hawaiian fruit-wine industry. The latter it inferred from the fact that the liquor tax exemption applied only to locally-produced beverages. Consequently, if there were any competition between the locally-produced exempt products and the more expensive nonexempt products, then there was a discriminatory effect. *Id.* at —, 104 *S.Ct.* at 3056, 82 *.L.Ed.*2d at 209. The Court concluded that even if a legislature's original intent was only to promote an ailing local industry rather than to discriminate against interstate commerce, this still would not save a tax from constituting impermissible economic protectionism. *Id.* at —, 104 *S.Ct.* at 3056, 82 *L.Ed.*2d at 210.

■ These recent cases establish that the commerce clause prohibits any discriminatory tax that has the effect of giving local industry a commercial advantage over its out-of-state competition. The impermissible advantage could be in the form of lower costs through a tax exemption, as in *Bacchus Imports,* in the form of increased taxes on interstate business, as in *Boston Stock Exchange,* an incentive to invest in intrastate rather than interstate enterprises, as in *Maryland v. Louisiana,* or in the form of an indirect subsidy through a credit as in *Westinghouse Elec. Corp. v. Tully,* 466 *U.S.* at 404, 104 *S.Ct.* at 1866, 80 *L.Ed.*2d at 401. There is no need to "know how unequal the Tax is before concluding that it unconstitutionally discriminates." *Maryland v. Louisiana,* 451 *U.S.* at 760, 101 *S.Ct.* at 2136, 68 *L.Ed.*2d at 604. And as long as there is *any* discrimination between intrastate and interstate products, there is a discriminatory effect.

## IV

■ Applying these principles to this case, we hold that the bus excise tax imposes an unconstitutional burden on interstate commerce. As recognized by the D.M.V., whether the bus operation is local or out-of-state, the excise tax is imposed on the use of New Jersey highways when the New Jersey mileage

is traversed in conjunction with a strictly interstate trip. It is the interstate character of the activity that occasions the tax on the intrastate incidents. Likewise, whether the taxpayer is a local business or an out-of-state carrier, the use of New Jersey highways does not result in a tax when the transportation of passengers is from one point in New Jersey to another point in New Jersey.

Thus, on its face the tax discriminates against interstate commerce. Nevertheless, D.M.V. contends that the tax does not so discriminate. D.M.V. reaches this conclusion by asking "whether the tax was intended or has the effect of actually or potentially handicapping, if not creating a barrier to, interstate commerce in favor of local competing businesses." In answering this question, D.M.V. states that the legislative history of the 1972 amendment to the excise tax and the receipts tax does not reflect any intent to restrict competition by interstate bus carriers or to promote economic protectionism for local interests. In support of this position, D.M.V. argues first that the excise tax does not have a discriminatory effect, for both domestic and foreign companies are treated equally. Since the tax exemption applies to regularly-scheduled bus service between points in New Jersey, whether it is provided by a New Jersey company or a foreign corporation, D.M.V. claims there is no local favoritism.

We find D.M.V.'s contention to be meritless. The question is whether there is a discriminatory effect on interstate commerce. If a tax otherwise discriminates against interstate commerce, it is irrelevant whether business entities that engage in that interstate commerce are domestic or out-of-state.

D.M.V.'s major argument, however, is that here, unlike in *Bacchus* and the other recent Supreme Court decisions, there is in fact no competition between intrastate and interstate bus service. D.M.V. argues that local regular-route passenger service, whether provided by intrastate operators or interstate operators, is significantly different from exclusively interstate

transportation services. This argument is unrealistic. For a bus rider confronted with the choice of riding an interstate carrier between Newark and Atlantic City (as part of its run between New York and Atlantic City), or taking an intrastate bus that travels only between Newark and Atlantic City, the interstate and intrastate bus companies are engaged in the same business and provide the same public transportation. As long as the rider has that choice, there is competition between interstate and intrastate bus service. Like pineapple wine and scotch, interstate bus travel inevitably competes with intrastate bus service whenever any of their routes overlap.

Lastly, D.M.V. contends that even if the tax is discriminatory, it is not *per se* unconstitutional because the burden on interstate commerce is outweighed by the state interest in promoting local bus passenger service. It bolsters its position by citation to a number of cases that hold where a statute regulates evenhandedly to effectuate a legitimate local public interest and its effect on interstate commerce is only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970); *U.S.A. Chamber of Commerce v. State*, 89 *N.J.* 131, 162 (1985); *Glassboro v. Gloucester County Bd. of Chosen Freeholders*, 100 *N.J.* 134 (1985).

Justice Brennan summarized the approach as follows:

Under the general rule [of determining whether the burden imposed on interstate commerce is permissible] we must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce. The burden to show discrimination rests on the party challenging the validity of the statute, but "[w]hen discrimination against commerce ... is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of non-discriminatory alternatives adequate to preserve the local interests at stake."

[*Hughes v. Oklahoma*, 441 *U.S.* 322, 336, 99 *S.Ct.* 1727, 1736, 60 *L.Ed.*2d 250, 262 (1979) (citations omitted).]

In essence, D.M.V. submits that even if the bus excise tax constitutes a burden, the indirect subsidy provided by the exemption for intrastate service far outweighs the inconvenience and added expense to interstate carriers such as Continental of paying their fair share of the state's cost of maintaining and improving roadways. While the Legislature's intent to support intrastate bus service may be laudatory, the result is that the burden of maintaining the highways and administering motor vehicle laws, as well as providing an indirect subsidy to intrastate bus companies, now falls disproportionately on intrastate commerce.

We addressed a similar issue in *Roadway Express, Inc. v. Director, Div. of Taxation*, 50 *N.J.* 471 (1967), where we held that the imposition of New Jersey's Corporation Business Tax on a trucking company conducting an exclusively interstate business involving substantial properties and activities in New Jersey did not violate the commerce clause. We held that the tax, which was fairly apportioned between intrastate and interstate commerce, was a nondiscriminatory means of requiring interstate commerce to pay its fair share of the cost of state government. If the tax was held not to apply to interstate businesses, that burden would have been paid solely by intrastate businesses. The facts in this case present a variant of those in *Roadway*. Here the burdens are placed *solely* on interstate commerce without any compensatory burdens imposed on intrastate commerce. The imposition of the burdens *solely* on *either* intrastate or interstate businesses results in a violation of the commerce clause.

Moreover, the State has not demonstrated the lack of nondiscriminatory alternatives. For example, a direct subsidy to intrastate carriers from state funds supplied by *all* citizens might accomplish the same result as an indirect subsidy financed solely by the imposition of the bus-excise tax on interstate commerce.

Accordingly, we hold that the bus-excise tax, *N.J.S.A.* 48:4–20, discriminates against interstate commerce in violation of the commerce clause. We need not decide whether it also violates the equal protection clause.

## V

■ We must, however, determine whether Continental is entitled to a refund pursuant to *N.J.S.A.* 48:4–20 for the excise tax paid from November 1977 to June 1979.[13]

In November 1979, when Continental realized that it had not excluded from its monthly reports the exempt mileage traversed in regular-route service in New Jersey, it filed a refund claim for those miles in the amount of $55,392.64. This covered the period from November 1977 to June 1979. Continental filed its claim with the Division of Taxation pursuant to the State Tax Uniform Procedure Law, *N.J.S.A.* 54:48–1 to –5. The Division of Taxation forwarded the claim for refund to D.M.V., which advised Continental that the bus-excise tax did not contain any provision authorizing a refund. However, D.M.V. further advised Continental that pursuant to *N.J.A.C.* 13:18–7.7, an overpayment of taxes may be used to offset future taxes in the three months following the end of the applicable tax month.

The Autobuses Act, *N.J.S.A.* 48:4–1 to –55, does not contain a provision dealing with tax refunds. And neither *N.J.S.A.* 48:4–24, nor its predecessors (the 1916 (*L.*1916, *c.* 136), 1934 (*L.*1934, *c.* 68) or the 1962 (*L.*1962, *c.* 198) versions) contains the word "refund" or any language expressly granting the Director the power to promulgate a regulation regarding refunds or credits.

---

[13]Continental in its trial brief for the first time contended that it is entitled to a refund for all taxes paid since January 1973 under *N.J.S.A.* 48:4–14, the effective date that *N.J.S.A.* 48:4–14 (the complementary tax) was repealed, except for taxes paid on charter miles. In its claim for refund, its complaint, and the pretrial order, however, Continental's claim was limited to taxes paid from November 1977 to June 1979.

Continental contends that the provisions of the State Tax Uniform Procedure Law, *N.J.S.A.* 54:48–1 to :52–4, apply to its refund claim.[14]  Specifically, Continental relies on *N.J.S.A.* 54:49–14, which provides:

> Any taxpayer, at any time within two years after the payment of any original or additional tax assessed against him, unless a shorter limit is fixed by the law imposing the tax, may file with the commissioner a claim under oath for refund, in such form as the commissioner may prescribe, stating the grounds therefor, but no claim for refund shall be required or permitted to be filed with respect to a tax paid, after protest has been filed with the commissioner or after proceedings on appeal have been commenced as provided in this subtitle, until such protest or appeal has been finally determined.

The State Tax Procedure Law, however, defines "State tax" as "any tax which is payable to or collectible by the state tax commissioner, and 'state tax law' means any tax which levies or imposes a state tax as herein defined." *N.J.S.A.* 54:48–2. Therefore, D.M.V. correctly contends that the State Tax Uniform Procedure Act is not applicable to Continental's claim because the bus-excise tax is not "payable to or collectible by the state tax commissioner" but payable to the Director of D.M.V., pursuant to *N.J.S.A.* 48:4–21.[15]

---

14The purpose of the State Tax Uniform Procedure Act is

to provide as far as feasible a uniform procedure to be followed by taxpayers in relation to any state taxes and to afford uniform remedies and procedures which may be resorted to by the state in the collection of any of its taxes. [*N.J.S.A.* 54:48–3.]

15*N.J.S.A.* 48:4–21 provides:

*Monthly report of mileage; payment of tax*

Every such owner or operator shall file with the *Director of the Division of Motor Vehicles* on or before the twenty-fifth day of each month a report, under oath, on such form as the director shall prescribe, which report shall disclose the number of miles such autobus shall have been so operated over the highways of this State during the preceding calendar month, together with the registration number of such vehicle and such other information as the director may require.

Every such person shall pay to the *director* upon the filing of such report the amount of tax due from such person as disclosed in the report. [Emphasis added.]

Instead, D.M.V. asserts that the applicable refund provision is *N.J.A.C.* 13:18–7.7, which states:

Overpayment of tax; credit against future liability.

If upon examination of the taxpayer's report or upon examination of his records it is determined that tax was paid in excess of that due, such excess may be applied against tax due in the three months following the end of the applicable tax month.

D.M.V. claims that this credit provision was promulgated pursuant to *N.J.S.A.* 48:4–24, which gives the Director general power to promulgate "rules and regulations as he may deem necessary." [16]

The Tax Court held that the Director exceeded his statutory authority in promulgating *N.J.A.C.* 13:18–7.7. It granted Continental a refund limited to two years based on Continental's failure to claim reimbursement for pre–1977 taxes in the complaint and pretrial order and on the legislative intent expressed in the State Tax Uniform Procedure Act, *N.J.S.A.* 54:48–1. The Appellate Division, without any discussion on the point, affirmed the Tax Court's opinion that Continental was entitled to a refund.

There is no specific statutory authority requiring a refund of the bus-excise tax due under *N.J.S.A.* 48:4–20.[17] There is only

---

[16]*N.J.S.A.* 48:4–24 provides:

The Director of the Division of Motor Vehicles shall enforce the payment of the excise hereby imposed and for such purpose make and enforce such rules and regulations as he may deem necessary. He may require a bond or other surety for the payment of excise and penalties imposed by and payable pursuant to sections 48:4–20 to 48:4–34 of this Title and for compliance with the provisions of said sections and the rules and regulations made by him pursuant hereto.

[17]*N.J.S.A.* 54:39A–19 specifically provides for refunds for motor fuels-use tax administered by the D.M.V. indicating that if the Legislature intended to provide refunds for excise taxes paid under *N.J.S.A.* 48:4–20, it could have done so.

regulation *N.J.A.C.* 13:17–7.7.[18]  The Legislature could have provided that refunds of excise tax be governed by the State Uniform Procedure Act.  For whatever reason, it has failed to do so.  While it appears reasonable that the State Uniform Procedure Act should govern refunds of the excise tax, we leave that determination to the Legislature.

■  Public policy discourages suits for the refund of taxes erroneously paid or illegally collected.  Governments are entitled to presume that statutes are constitutional.  Government budgets are prepared on an annual cash basis.  *Lavin v. Hackensack Bd. of Educ.*, 90 *N.J.* 145, 154 (1982).  Therefore, in the absence of a statutory limitation on the time in which a taxpayer may file suit to declare a tax unconstitutional, governments would be subject to substantial liabilities from refunds of those unconstitutional taxes.  Accordingly, in the absence of statutory authority, taxes voluntarily, although erroneously, paid even under an unconstitutional statute cannot be refunded. *Berry v. Daigle*, 322 *A.*2d 320, 326–27 (Me.1974); 72 *Am.Jur.*2d State and Local Taxation ¶ 1074, 1087 (1974).

It long has been the general common-law rule that where a party, without mistake of fact, fraud, duress, or extortion, voluntarily pays money on a demand that is not enforcible against him, he may not recover it.  *In re Fees of State Bd. of Dentistry*, 84 *N.J.* 582, 588 (1980); *Koewing v. West Orange*, 89 *N.J.L.* 539 (E. & A.1916); *Camden v. Green*, 54 *N.J.L.* 591, 593 (E. & A.1892); *Restatement of Restitution* § 75, comment f (1937).[19]  We most recently addressed this issue in *In re*

---

[18]Neither party contends that *N.J.A.C.* 13:17–7.7 is invalid.  Accordingly, we need not and do not address the Tax Court's holding that the Director of D.M.V. exceeded his authority in promulgating the regulation.

[19]In *Camden v. Green*, 54 *N.J.L.* 591, 593 (E. & A.1892), the Court held that a party who paid $500 for a liquor license shortly after the County Board of License Commissioners had lowered the fee to $300 paid the fee voluntarily because he had full knowledge of the fee change.  He also apparently paid the fee without protest.

*Fees of State Bd. of Dentistry*, 84 *N.J.* 582. That case concerned the interpretation of a statute, *N.J.S.A.* 45:1–3.2, that granted the Board of Dentistry the power to promulgate rules setting the "charges for examinations, licensures and other services." *Id.* The Board was given authority to impose fees that were necessary to defray its proper expenses. Promptly after the fee schedule was enacted, the New Jersey Dental Association challenged it as being excessive. The Association did not seek a stay of the revised fees pending judicial review. The Appellate Division held that the fees were excessive, but rejected the Association's efforts to obtain a refund. *Id.* at 587. We ordered the Board to refund the difference between the fees collected and the Board's actual expenses during the period in question. *Id.* at 586.

In *Board of Dentistry*, we noted that case law in New Jersey established "the principle that when a tax already collected is set aside by judicial decision, 'the law raises an assumption to refund the money which can no longer be honestly retained.'" *Id.* at 587 (citations omitted). We recognized the primary exception to this principle as the aforementioned "volunteer rule." We found that the dentists in that case did not pay the fee voluntarily but under duress. "The dentists have had no choice but to pay the registration fee if they were to continue to practice their profession legally." *Id.* at 589. In addition, the dentists promptly challenged the fee after the enactment of the fee schedule.

We conclude there is no evidence in this case that Continental paid the tax under duress or protest, evidenced by its act in paying both the tax under the statute that was not due, as well as the tax that we today declare unconstitutional. Here, we have a typical taxpayer paying a tax under a mistake of law.[20]

---

[20]Justice Stein in his dissent states that a tax paid under a statute that is later declared unconstitutional is not paid under a mistake of law. Voluntary payment of a tax made in the belief that the law imposing it was valid, even where the tax was later declared to be unconstitutional, is paid under a mistake

Since the repeal of the complementary statute in 1972, Continental filed monthly reports with the D.M.V. in which it included all the mileage it accumulated in New Jersey. As it states in its complaint, "[u]pon discovery of the mistaken mileage reported and overpayment of tax, Plaintiff filed a refund claim, etc." Continental erroneously mistook the law, filed monthly reports, and regularly paid the taxes as prescribed by *N.J.S.A.* 48:4–21. It never questioned the tax payments until November 1979. It certainly did not pay them under protest.

We conclude that Continental is not entitled to the refund. The Legislature did not provide for a refund of erroneously or mistakenly-paid bus-excise taxes; and Continental voluntarily paid the contested amounts for seven years under a mistake of law.

As modified, the judgment of the Appellate Division is affirmed.

STEIN, J., dissenting in part.

I am in full agreement with the majority's conclusion that the autobus excise tax, *N.J.S.A.* 48:4–20, discriminates against interstate commerce in violation of the Commerce Clause. I cannot, however, agree with the majority's conclusion that Continental is not entitled to a refund.

Preliminarily, the majority fails to distinguish the taxes paid by Continental in connection with the interstate transport of passengers, which the Court today holds to be unconstitutional, from the taxes mistakenly paid by Continental for intrastate mileage traversed in regularly scheduled passenger service provided under the the authority of the PUC. According to the majority, Continental was a volunteer that paid its tax "under a mistake of law." *Ante* at 549. However, the only tax paid by Continental under a mistake of law was the tax on intrastate

of law, thereby precluding recovery of the amount paid. *Berry v. Daigle,* 322 *A.* 2d 320, 326 (Me.1974); 72 *Am.Jur.*2d State and Local Taxation, ¶ 1087.

mileage over routes approved by the PUC. *R.S.* 48:4–3. As the Tax Court noted, the balance of Continental's taxes were not paid mistakenly but rather because they were mandated by the statute. 6 *N.J.Tax* 42, 58 (1983). Had Continental failed to pay the tax on interstate mileage, which we invalidate today, it would have been subject to revocation of its registration to operate autobuses in New Jersey. *N.J.S.A.* 48:4–30. As we noted in *In re Fees of State Bd. of Dentistry,* 84 *N.J.* 582, 589–90 (1980), "[i]t is well-established that the payment of a tax in order to avoid the loss of the payor's right * * * to continue in business renders the payment involuntary and removes it from the ambit of the volunteer rule." The majority's application of the "volunteer rule" to the excise tax on interstate transportation of passengers is obviously misplaced.[1]

As the majority acknowledges, we noted in *Board of Dentistry* the established principle "that when a tax already collected is set aside by judicial decision, 'the law raises an assumption to refund the money which can no longer be honestly retained.' The taxing entity has 'not a particle of right to the money in question,' which is due to the taxpayer 'according to principles of common honesty.' " *Id.* at 587 (citations omitted). That doctrine plainly applies to the tax which the Court today holds to be unconstitutional.

However, even the "volunteer rule," on which the majority relies to deny Continental's entire claim for refund, is of questionable application to the excise taxes paid mistakenly by Continental. Pursuant to the State Tax Uniform Procedure Law, *N.J.S.A.* 54:48–1 to 52–4, a statute enacted "to provide as far as feasible a uniform procedure to be followed by taxpayers

---

[1]The only support the majority is able to muster for its conclusion is the common law of Maine, which provides that "[m]ere protest without showing a purpose to avoid arrest of person or seizure of property does not preserve the right to recover taxes paid." *Berry v. Daigle,* 322 *A.*2d 320, 326 (Me.1974) (citations omitted). This decision is not consistent with New Jersey law. *See In re Fees of State Bd. of Dentistry,* 84 *N.J.* 582, 589–90 (1980).

in relation to any state taxes," *N.J.S.A.* 54:48–3, the volunteer rule appears to be superseded. *N.J.S.A.* 54:49–16 provides as follows:

> Where no questions of fact or law are involved and it appears from the records of the Commissioner that any monies have been erroneously or illegally collected from any taxpayer or other person *or have been paid by any taxpayer or other person under a mistake of fact or law,* the Commissioner may at any time, within two years of payment, unless a shorter limit is fixed by the law imposing the tax, upon making a record in writing of his reasons therefor, certify to the comptroller that the taxpayer is entitled to such refund and thereupon the comptroller shall authorize the payment thereof from the appropriation for such purpose. [Emphasis added.]

This statutory provision makes it clear that the legislative intent was to authorize the refund of taxes paid by taxpayers even under a mistake of fact or law.

The State Tax Uniform Procedure Law would appear to settle the matter of Continental's claim for a refund with respect to both the tax mistakenly paid and the tax on interstate passenger transport which the Court holds to be unconstitutional. However, the majority points out that the State Tax Uniform Procedure Law only applies to a tax "which is payable to or collectible by the state tax commissioner," *N.J.S.A.* 54:48–2, whose duties were subsequently transferred to the Director of the Division of Taxation. *N.J.S.A.* 52:27B–48. The majority concludes that since the taxes in question are payable to the Director of the Division of Motor Vehicles rather than to the Director of the Division of Taxation, the State Tax Uniform Procedure Law and its refund provisions are inapplicable.

I find this interpretation of the statute to be too restrictive. As the Tax Court appropriately pointed out, "[t]here is no reason to distinguish among taxes paid to the State of New Jersey on the basis of which division of state government is the payee." 6 *N.J.Tax* at 59. Such a construction of the statute is unreasonable, and we should not distort the legislative intent by so literal a reading. The Tax Court also observed that the State Tax Uniform Procedure Law imposes a two-year limitation on refunds of taxes paid to the Division of Taxation and concluded that the same limitation should apply to refunds of

taxes paid to the Division of Motor Vehicles. *Id.* I find the reasoning of the Tax Court on this issue to be unassailable.

Accordingly, I respectfully dissent from that portion of the majority opinion that denies Continental's claim for a refund.

Justice CLIFFORD joins in this opinion.

O'HERN, J., dissenting.

The Court today strikes down New Jersey's excise tax on bus operations, *N.J.S.A.* 48:4–20, concluding that the tax unconstitutionally discriminates against interstate commerce because certain carriers are granted an exemption from the tax if they provide an instate service to New Jersey's commuters and travelers. Because I believe that intercity bus service and commuter service are not substantially equivalent taxable events, and there is no direct discrimination against out-of-state operators who engage in the same business, I believe the Constitution does not compel the result reached by the majority.

The Commerce Clause simply provides that "[t]he Congress shall have Power * * * [t]o regulate Commerce * * * among the several States * * *." *U.S. Const.*, art. I, sec. 8, cl. 3. Although stated as a grant of power to Congress, the clause has been read as imposing some limitations on states even in the absence of action by Congress. *See, e.g., City of Philadelphia v. New Jersey*, 437 *U.S.* 617, 623, 98 *S.Ct.* 2531, 2535, 57 *L.Ed.*2d 475, 481 (1978) (subjects of potential federal regulation that have escaped congressional attention "are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself").

The negative implications of the grant of power to Congress have been referred to as " 'silent,' 'negative,' and 'dormant.' " Eule, *Laying the Dormant Commerce Clause to Rest*, 91 *Yale L.J.* 425, 425 n. 1 (1982). When a court interprets this dormant aspect of the Commerce Clause, it will, on occasion, invalidate unwarranted state intrusion into commerce; a court should not do so, however, merely because it believes it to be in the public

interest to determine policy where Congress has not. The establishment of transportation or tax policy for a state is for the other branches of government. *Cf. Northwest Airlines, Inc. v. Minnesota*, 322 *U.S.* 292, 302, 64 *S.Ct.* 950, 955, 88 *L.Ed.* 1283, 1290 (1944) (Black, J., concurring) ("The Constitution gives [Congress] the power to regulate commerce among the states, and until it acts I think we should enter the field with extreme caution"). Our constitutional traditions have been similar. " 'To declare a statute unconstitutional is a judicial power to be delicately exercised.' " *Harvey v. Board of Chosen Freeholders of Essex County*, 30 *N.J.* 381, 388 (1959) (quoting *Wilentz v. Hendrickson*, 133 *N.J.Eq.* 447, 487 (Ch. 1943), *aff'd*, 135 *N.J.Eq.* 244 (E. & A.1944)). A legislative act should not be declared void "unless its repugnancy to the constitution is clear beyond reasonable doubt." *Gangemi v. Berry*, 25 *N.J.* 1, 10 (1957). I cannot dispel that reasonable doubt in this case and therefore must dissent.

The majority opinion reflects a formalism once prevalent in analysis of state taxation of interstate commerce. But in *Complete Auto Transit, Inc. v. Brady*, 430 *U.S.* 274, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326 (1977), the United States Supreme Court abandoned altogether " 'the use of magic words or labels' [that] could 'disable an otherwise constitutional levy' " and recognized that they no longer served an analytic function. *Id.* at 284–89, 97 *S.Ct.* at 1081–1084, 51 *L.Ed.*2d at 334–37 (quoting *Railway Express Agency v. Virginia*, 358 *U.S.* 434, 441, 79 *S.Ct.* 411, 416, 3 *L.Ed.*2d 450, 456 (1959)). "[I]nterstate commerce may be made to pay its way." 430 *U.S.* at 284, 97 *S.Ct.* at 1081, 51 *L.Ed.*2d at 334. The Court shifted its focus away from labels to the question of "whether the tax produces a forbidden effect." *Id.* at 288, 97 *S.Ct.* at 1083, 51 *L.Ed.*2d at 337.

Having replaced formalisms with economic reality, the Court developed a simpler, more straightforward approach based on an analysis of the effects of the tax: a tax will be sustained against a Commerce Clause challenge when the tax applies to an activity with a substantial nexus with the taxing state, is

fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. *Id.* at 285–89, 97 *S.Ct.* at 1082–84, 51 *L.Ed.*2d at 335–37.

The problem with this tax is that it looks, sounds, and reads like one that is discriminatory. It is understandable then for the majority to conclude that this tax is discriminatory since, on its face, it appears to be so. However, our duty is to look deeper than appearance. When considering whether a tax is discriminatory for the purposes of competition, the flow of commerce is measured in terms of the nature of the transactions involved, not in legal abstractions.

Recognizing that the decisions of the United States Supreme Court had left little in the way of precise guides to the states in the exercise of their indispensable powers of taxation, Justice Clark once observed: "From the quagmire there emerge, however, some firm peaks of decision which remain unquestioned. It has long been established doctrine that * * * a State [may not] impose a tax which discriminates against interstate commerce * * * by providing a direct commercial advantage to local business * * *." *Northwestern States Portland Cement Co. v. Minnesota,* 358 *U.S.* 450, 458, 79 *S.Ct.* 357, 362, 3 *L.Ed.* 2d 421, 427 (1959). I simply find that aspect missing from this case. A New Jersey business engaged in bus transportation gets no break on routes that compete with Trailways.

The relevant inquiry is whether or not the differing taxpayers are engaged in "substantially equivalent event[s]." *Maryland v. Louisiana,* 451 *U.S.* 725, 759, 101 *S.Ct.* 2114, 2135, 68 *L.Ed.*2d 576, 603 (1981). In *Boston Stock Exchange v. State Tax Comm'n,* 429 *U.S.* 318, 97 *S.Ct.* 599, 50 *L.Ed.*2d 514 (1977), the Court found the fatal defect in the New York stock transfer tax to be that the same transaction, *i.e.,* sale of securities that would be transferred or delivered in New York, was subjected to differing tax consequences on the basis of whether the transaction took place in state or out of state. *Id.* at 332, 97 *S.Ct.* at 608, 50 *L.Ed.*2d at 526. The commodity was identical.

It was plain to the Court that New York had created a tax granting a direct commercial advantage to local businesses. *Id.* at 331, 97 *S.Ct.* at 607, 50 *L.Ed.*2d at 525. However, when the transactions are different, a different tax may be imposed. *See, e.g., Alaska v. Arctic Maid,* 366 *U.S.* 199, 204–05, 81 *S.Ct.* 929, 932, 6 *L.Ed.*2d 227, 231 (1961) (no discrimination where tax on operation of freezer ships is greater than tax on local fish processors since the businesses are not competitive).

We must then look beyond appearance and try to focus upon the commercial event that is involved here. I am certain that the commuter standing at a roadside in Scotch Plains would not fail to see that a Trailways bus that roars through the community on its route between Miami and Boston is not engaged in the same business as a bus company that provides public transportation from that point to another point within the commuter shed. There really should be no question in the minds of the majority that intercity bus service is an entirely distinct commodity from commuter bus service. *See Salorio v. Glaser,* 93 *N.J.* 447, 459, *cert. denied,* 464 *U.S.* 993, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983) (comparing journeys to work within, from, and to New Jersey, all modes). In essence, the Court now holds that the State cannot tax this commodity, a discrete aspect of interstate commerce, unless it taxes a different commodity, intrastate or commuter bus service. While a case of discrimination might be made in particular circumstances when the transportation products are analyzed, the primary facial effect of the tax is not discriminatory because it rationally distinguishes between products.

In the last analysis, the issue is whether the state has given something for which it may ask for something in return. In the case of commuter bus service, the benefits to the state are self-evident. Not only is a transportation crisis eased, but air-pollution problems and energy-consumption problems are addressed by the delivery of the local bus service. The same holds true for intrastate bus services essential to the New

Jersey job market. Hence, important public purposes, which are not related to intercity bus transportation, are served by the provision of intracity or commuter service.

The essence of discrimination under the Commerce Clause was expressed thus in *Boston Stock Exchange v. State Tax Comm'n, supra:*

> Our decision today does not prevent the States from structuring their tax systems to encourage the growth and development of intrastate commerce and industry. Nor do we hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy. We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.

[429 *U.S.* at 336–37, 97 *S.Ct.* at 610, 50 *L.Ed.*2d at 528–29.]

The intricate relationship between state and national domain in the field of mass transit was outlined in *Garcia v. San Antonio Metropolitan Transit Auth.*, 469 *U.S.* ——, 105 *S.Ct.* 1005, 83 *L.Ed.*2d 1016 (1985). There, the federal interest in supporting urban mass transit was an important factor in considering Congress' power to regulate wages in that area. *Id.* at ——, 105 *S.Ct.* at 1019–1020, 83 *L.Ed.*2d at 1036–37. The issue, however, was the sweep of Congress' power, and not, as here, the negative restraints of the Commerce Clause. *Id.* at ——, 105 *S.Ct.* at 1020–1021, 83 *L.Ed.*2d at 1037–38. Given the essentiality of transportation to a state's sovereign function, the negative or dormant aspect of the Commerce Clause is not directly relevant. It is only when the state regulates the commercial market for the advantage of its private citizens that it may be found to offend the constitutional policy against economic balkanization.

In sum, I believe that only a formalistic analysis could lead to the conclusion that this tax is unconstitutionally discriminatory. The excise tax furthers no New Jersey private interest since it treats both resident and nonresident deliverers of the same service equally and is rationally related to an important public

558

purpose. The Constitution does not require the invalidation of this tax.

*For affirmance as modified* —Chief Justice WILENTZ, and Justices POLLOCK, HANDLER and GARIBALDI–4.

*For affirmance*—Justices CLIFFORD and STEIN–2.
*For reversal*—Justice CLIFFORD–1.